**In re Jan Richard SCHLICHTMANN, Debtor.**

**No. 91–18387–RS.**

United States Bankruptcy Court, D. Massachusetts.

Sept. 25, 2007.

**46**

Garve Ivey, Jr., Ivey & Ragsdale, Jasper, AL, for Debtor.

Jan Richard Schlichtmann, Jan R. Schlichtmann Atty. at Law PC, Prides, Crossing, MA, pro se.

### MEMORANDUM OF DECISION ON DEBTOR'S MOTION FOR SANCTIONS FOR VIOLATION OF DISCHARGE ORDER

ROBERT SOMMA, Bankruptcy Judge.

By the motion before the Court, debtor Jan Richard Schlichtmann ("Schlichtmann" or "the Debtor") seeks compensatory and punitive damages and related injunctive relief against The Cadle Company, Inc., its principal Daniel C. Cadle, and an affiliate, Atlanta Joint Venture, L.P. (collectively, "the Respondents") for violating his Chapter 7 discharge. He also seeks damages against the same parties for alleged fraudulent misrepresentations, made by their former attorney to the Court in the course of these proceedings, on the theory that the misrepresentation was a fraud upon the court. By agreement of the parties, issues of liability have been tried first, with damages to be quantified in a second phase, if necessary. After a trial on the issues of liability, and pursuant to FED.R.CIV.P. 52(a), the Court now enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT AND PROCEDURAL HISTORY [1]

#### a. Initial Events

1. At all relevant times, Schlichtmann has been a practicing attorney. From 1986 through December 1990, he was and had for some time been a partner in the law firm of Schlichtmann, Conway & Crowley and then of Schlichtmann, Conway, Crowley & Hugo ("SCC & H").[2] His partners in SCC & H were Kevin P. Conway, William J. Crowley, and Michael R. Hugo. Commencing in late 1986, Schlichtmann and the firm (first SC & C and later SCC & H) represented the plaintiffs in certain environmental litigation in the Middlesex Superior Court, known as *Coble v. FL Aerospace Corp.* ("the Groton matter"), and the firm had entered into a contingency fee agreement with the plaintiffs for its

---

**1.** The procedural history of the matters now before the Court is extensive and, to a large extent, intertwined with and part of the substance of this controversy. I will therefore set out the facts and procedural history together, to eliminate redundant recitations and to render both the facts and the procedural history more intelligible than might otherwise be possible. The immediate procedural history, including the substance of the Motion for Sanctions that is presently under consideration, is set forth at paragraphs 108–118.

**2.** In 1986, Mr. Hugo was not yet a partner in the firm. He became a partner at some time between 1986 and the firm's incurring of the debt at issue.

services in that matter, with the fee to be paid at the conclusion of the litigation.

2. In 1990, SCC & H borrowed funds from the Boston Trade Bank, as evidenced by three promissory notes (collectively, "the SCC & H notes"). The first, a revolving note dated June 19, 1990, was in the principal amount of $150,000 and payable on demand. The second, dated October 31, 1990, was in the principal amount of $45,000 and payable on December 31, 1990. And the third, dated December 31, 1990, was in the principal amount of $40,000 and payable on January 31, 1991. The rates of interest on all three were variable.

3. To secure these notes, the firm gave the Bank a security interest in all assets of the firm, including the account receivable arising from its fee agreement in the Groton matter. Each individual partner, including Schlichtmann, also guaranteed the notes. Schlichtmann was liable for the full debt of SCC & H on these notes, not only as a guarantor but also as a general partner of SCC & H.

4. On December 27, 1990, Schlichtmann, on stationery of SCC & H, sent a letter to Anthony Zinna, a loan officer at the Boston Trade Bank, concerning the status of the firm's outstanding loans "and the attorney's fees which will be sufficient to pay them off." The letter informed Mr. Zinna that the firm anticipated receiving some $406,000 in fees from monies already being held in escrow in conjunction with a settlement of the Groton matter. Schlichtmann said in the letter: "I want to assure you of the bank's security interest in these anticipated fees in the Groton case," Schlichtmann said in the letter. He also stated: "Out of the first payment we will pay off the $45,000 note."

5. In June 1991, the parties to the Groton matter entered into, and the Superior Court approved, a settlement agreement as to that matter. Under the agreement, two funds were to be established and distributed. The first, consisting of $800,000 in an escrow account funded by the settling defendants, was to be distributed to the Plaintiffs and their counsel (in partial payment of counsel's fee) within six months of execution of the agreement. These funds were in fact released to SCC & H in June 1991. SCC & H first deposited the funds in their client funds account; from that account, the firm transferred the portion constituting the firm's fee, approximately $230,000.00, to the firm's own operating account. (The date of the latter distribution is unclear.) This fee was paid entirely to SCC & H, not to Schlichtmann (at least not in the first instance). There is no evidence as to how the firm disbursed the funds; it is clear, however, that the firm, made no payment from it on the promissory notes.

6. The second fund, root of the present troubles, consisted of an additional $825,000 that, in June 1991, was deposited into an escrow account for ultimate distribution to the plaintiffs and their counsel. This fund was controlled by counsel for the Groton defendants, acting as escrow agent, not by Schlichtmann. Under the approved settlement agreement, the distribution of this fund was contingent upon and subject to approval of a remediation plan by the Massachusetts Department of Environmental Protection. The release of the second fund would require more legal work by Schlichtmann on behalf of the plaintiffs, which work eventually came to fruition only in 1995.

7. Jan Schlichtmann filed a petition for relief under Chapter 7 of the Bankruptcy Code on October 7, 1991, thus commencing the present bankruptcy case. Although he obtained the advice of an attorney, Joseph Schindler, in preparing his bankruptcy petition and related schedules and statement of financial affairs, Schlichtmann nonethe-

less filed the petition *pro se.* In its initial phase, his bankruptcy case was routine and uneventful: Schlichtmann filed the requisite bankruptcy schedules and statement of financial affairs; he appeared for and was examined at the statutorily-required meeting of creditors; the Chapter 7 Trustee reported that no assets would be available for distribution to creditors; no objection to discharge or to the dischargeability of any debt was filed; and on January 28, 1992, the court entered a discharge order under 11 U.S.C. § 727.[3] Two days later, the case was closed.

8. By operation of the Uniform Partnership Act as adopted in Massachusetts, a partnership is dissolved upon the bankruptcy filing of one of its partners. G.L. c. 108A, § 31(5) ("Dissolution is caused ... [b]y the bankruptcy of any partner....."). Therefore, the partnership of SCC & H was dissolved by operation of law *no later than* the date of Schlichtmann's bankruptcy filing, October 7, 1991. Schlichtmann at times has testified that the partnership was dissolved upon his bankruptcy filing.[4]

a. However, there is evidence in the record that dissolution occurred long before the bankruptcy filing. In the Statement of Financial Affairs he signed under penalty of perjury and filed in his bankruptcy case, Schlichtmann stated that he was a partner in SCC & H "until 12/90." In response to a question asking him what occurred in December 1990 that effectuated or gave notice of his withdrawal from the partnership, Schlichtmann testified that, in December 1990—a time when he was exhausted and his partners were carrying the partnership and, except for the Groton matter, he was not—he and his partners reached an oral agreement that the partnership thenceforth was theirs (i.e., the remaining partners') alone and no longer also his. Schlichtmann drafted no written notice of his withdrawal; nor did the partners execute a written agreement memorializing the dissolution. (Transcript, 6–17–05, at pp. 160–162.) There is no evidence in the record as to precisely which day in December 1990 this alleged oral agreement was reached.

b. There is cause in the record to doubt that dissolution occurred in December 1990. First, one of the three promissory notes at issue was executed by William Crowley on behalf of SCC & H on December 31, 1990. This is inconsistent with dissolution of the partnership on or before that date. Second, even in June 1991, Schlichtmann himself continued to sign pleadings in the Groton matter on behalf of SCC & H.[5] Third, in an affidavit of William Crowley (Debtor's Ex. 2, p. 108), Mr. Crowley states that the partnership was dissolved in 1991.

c. Still, other evidence tends to corroborate that dissolution at least preceded the bankruptcy filing. In an August 27,

---

3. This case was commenced in 1991, long before the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Accordingly, it is governed by the Bankruptcy Code as it existed prior to the 2005 amendments and, indeed, many amendments since the filing date. All references to the Bankruptcy Code are to provisions existing at the time of Schlichtmann's bankruptcy filing.

4. In the District Court trial, he stated that "that partnership remained until 1991." (Transcript, trial day 7, Debtor's Exhibit 2, p. A1440.) Schlichtmann's affidavit of 7/12/95 in the District Court Action states that the partnership was dissolved in 1991. (Affidavit, ¶ 7)

5. See, for example, the Joint Motion for Approval of Settlement and Dismissal of Claims, a copy of which is part of Debtor's Exhibit 14.

1991 letter from William Crowley to the FDIC (as liquidating agent of BTB), Crowley explains: "One signer to the loans held by the F.D.I.C., Mr. Schlichtmann, now has the status of 'Of Counsel' to the firm. This means he is no longer a partner, and no longer has any ongoing business here." This letter in on letterhead that still identifies the firm as *Schlichtmann*, Conway, Crowley & Hugo (emphasis added) but also lists Jan Schlichtmann as "Of Counsel."

d. For present purposes, the Court need not decide when SCC & H was dissolved. It is sufficient to find, as I do, that the record is unclear, that dissolution is likely to have occurred as early December 31, 1990,[6] that it certainly did occur no later than August 27, 1991, and that Schlichtmann and the partnership failed to memorialize or keep records of this important event in their financial histories.

9. After Schlichtmann's departure, the three remaining partners formed a new firm without Schlichtmann, eventually (though not immediately) becoming known as Conway, Crowley & Hugo, P.C. ("CC & H"). Here again, the precise date of the formation of the new firm is unclear: either 1991 or, at the latest, early in 1992. Immediately after his departure, Schlichtmann became a sole practitioner. For a time, he continued to work for his former partners on an "of counsel" basis.[7] Nowhere in the record has he indicated what work he performed in that capacity and whether and how he was compensated for that work. It is unclear whether, during any period, he worked on the Groton matter on an "of counsel" basis and whether and how much he was paid by his former partners for such services.

10. After Schlichtmann left SCC & H, he entered into an agreement with his former partners. They agreed that Schlichtmann, as an independent practitioner, would take over from SCC & H the representation of the plaintiffs in the Groton matter. For his continuing work on the case, Schlichtmann as an independent practitioner, would receive two-thirds of any fee that would be recovered in the matter; the former partners would receive the remaining one-third.[8] This agreement, too, was not reduced to writing. The agreement involved an appropriation of SCC & H's interest in the Groton fee, which interest was subject to a security interest in favor of Boston Trade Bank, but neither Boston Trade Bank nor any subsequent assignee of its lien rights was party to or consented to this agreement. Schlichtmann has testified that the Groton plaintiffs were party to this agreement, but no evidence has been adduced to corroborate their knowledge of or participation in the agreement.

The date of the agreement, too, is unclear. Schlichtmann testified that the agreement occurred after his own bankruptcy filing, such that his right to a fee arising from the Groton matter came into existence only after his bankruptcy filing. There is reason to doubt Schlichtmann's

---

6. Here I am deeming more credible Schlichtmann's representation in his Statement of Financial Affairs, because he made that representation before this controversy commenced, and because a prebankruptcy dissolution is corroborated by Crowley's letter.

7. In Schedule I of his bankruptcy schedules, Schlichtmann lists total income for 1991 (through the date of his bankruptcy filing, October 7, 1991) of $13,500.00, all in the nature of "fees for consulting work," including only $3,000 from "SCC & H."

8. At this time, SCC & H was in its winding-up phase and apparently insolvent. Nonetheless, the agreement made no provision for any portion of the fee to be paid to SCC & H or its creditors.

testimony about the timing. First, if dissolution of the firm occurred in December 1990, as Schlichtmann himself has testified, then the former partners would have had to address the status of the Groton matter very shortly thereafter. As Schlichtmann himself testified, this six-month period between December 1990 and June 1991 was a critical and busy time in the Groton matter: a preliminary settlement had been reached, but resolution of the details required Schlichtmann's expertise and familiarity with the case, which the remaining partners were unable to provide. Among the partners of SCC & H, only he could handle it. At least from December 1990, only he did handle it. He did so with the knowledge and (at least tacit) permission of his former partners: he took over the Groton matter from SCC & H, investing substantial time and effort (at least between December 1990 and June 1991) that in June 1991 resulted in an approved settlement agreement and an initial fee distribution. Did he do this without having discussed with his former partners whether and how he would be compensated for his post-dissolution efforts? It is difficult to believe that they would not have addressed and resolved this issue sometime before the first distribution in June 1991. Throughout these proceedings, Schlichtmann has adamantly maintained that, for all services he rendered from the moment he became an independent practitioner, he himself, as opposed to SCC & H, was entitled to compensation. I find it more likely than not that Schlichtmann reached his agreement with his former partners during this time period, and not after his bankruptcy, and that, if and to the extent that he had a separate right to a fee from SCC & H, he began earning his fee in the Groton case before his bankruptcy filing.

11. In the schedule of personal property that he filed in his bankruptcy case on October 7, 1991, Schlichtmann did not indicate that he personally had any interest in the fee payable from the Groton litigation. The form called for him to list "accounts receivable," "other contingent and unliquidated claims of every nature," "other personal property of any kind not already listed," even "interests in partnerships." Nowhere is the right to a fee from the Groton litigation mentioned or disclosed. Nor did Schlichtmann ever amend this schedule. Nor did Schlichtmann disclose his interest in SCC & H in response to the item regarding "interests in partnerships." [9]

12. Schlichtmann contends that at the so-called "meeting of creditors" in his bankruptcy case,[10] which meeting was held on November 5, 1991, his attorney, Joseph Schindler, orally disclosed to the Chapter 7 Trustee, Ellen Carpenter, that Schlichtmann would be assuming responsibility for the Groton matter, the contingent nature of the recovery, and that a fee would be paid and shared with Schlichtmann's former firm if Schlichtmann's post-bankruptcy efforts in the matter were successful. For several reasons, the Court cannot determine the veracity of this contention. First, although an audiotape recording was made of this meeting, the tape has been lost or destroyed. Second, Mr. Schindler has passed away. Third, before his death,

9. Though the partnership had by then been dissolved, the winding down had not been completed, and Schlichtmann therefore continued to have an interest in the partnership, including liability for partnership obligations and an interest in any surplus. He was obligated to disclose his interest in SCC & H.

10. The meeting, which is required by 11 U.S.C. § 341, is an occasion for the Chapter 7 trustee to examine the Debtor. Creditors may attend but need not. As it happened, no creditor attended this meeting.

Mr. Schindler prepared an affidavit on the issue in 1998, but the averments therein were not subject to cross-examination; moreover, Schindler had prepared the affidavit in aid of his client, Schlichtmann, and therefore was hardly disinterested. Fourth, Carpenter had no notes from the meeting, her records having been destroyed in a flood. Fifth, and most important, Carpenter testified in 1999 that her memory of what happened at the meeting of creditors differed from and "conflicts with" Schindler's (as stated in his 1998 affidavit)[11] and that she first learned of the contingent fee only much later, in 1998. In sum, the evidence presents an unresolved conflict on the issue. Therefore, I cannot find by a even preponderance of the evidence that Schindler made the disclosures that Schlichtmann contends he made. In any event, any disclosure that Schlichtmann may have made at the meeting of creditors, either through Schindler or otherwise, did not reach his creditors and did not satisfy any obligation that Schlichtmann may have had to disclose the same matters in his bankruptcy schedules.

13. After his bankruptcy filing in October 1991, Schlichtmann expended substantial time and effort on the Groton matter through the date of its successful resolution in June 1995. However, no evidence as been adduced as to how much time and effort he expended during this period, either in absolute numbers or as a fraction of total time he and SCC & H invested in the matter since its commencement. In November 1992, Schlichtmann associated with the firm of Thomas M. Kiley on an "of counsel" basis. Though Schlichtmann remained an independent practitioner, his work on the Groton matter from and after November 1992 required substantial services and support of Kiley's firm. Schlichtmann has adduced no evidence as to the precise nature and extent of this service and support that Kiley's firm provided.

14. In the late spring of 1991, before Schlichtmann filed his bankruptcy petition, the Boston Trade Bank, experiencing troubles of its own, was taken over by the Federal Deposit Insurance Corporation ("FDIC"). On February 5, 1992, after Schlichtmann's bankruptcy case was closed, the FDIC, as liquidating agent of Boston Trade Bank, sold the Bank's rights against the firm, including the three promissory notes and attendant security agreements and guarantees, to The Cadle Company, Inc. ("TCC"). The FDIC, as liquidating agent, effectuated the transfer by endorsing the promissory notes over to TCC with the endorsement on each note, "Pay to the order of: The Cadle Company, without recourse." At the time, the principal balances owing on the three notes were $149,939.08 on the first, $45,000 on the second, and $40,000 on the third; the extent of interest and other charges then owing is not in evidence.

### b. *The Cadle Company, Atlanta Joint Venture, and TCC's Acquisition of SCC & H Notes*

15. TCC is an Ohio corporation, incorporated in 1987. Daniel C. Cadle ("Daniel") is its founder and sole owner and since its inception has been its president. TCC is in the business of purchasing and

---

11. Schlichtmann's attorney asked Carpenter, "Do you have any basis or reason to believe that anything that Mr. Schindler said was inaccurate?" Carpenter responded, "It conflicts with my memory of the 341 meeting." Schlichtmann's attorney then asked: "So you dispute what Attorney Schindler said?" Carpenter answered: "His recollection is different than mine." Schlichtmann's attorney then changed the subject and did not inquire into Carpenter's memory of what occurred or how it conflicted with Schindler's.

acquiring debt at discount for affiliated investment entities and then servicing and enforcing that debt for those same entities against the account debtors.

16. TCC purchased the SCC & H notes with funds provided by an Ohio limited partnership known as Atlanta Joint Venture Limited Partnership ("AJV").[12]

17. TCC is and at all relevant times has been the general partner of AJV and an interest holder in AJV.[13] Since the formation of AJV in 1987, Daniel Cadle, TCC, and members of Daniel Cadle's extended family have together owned all or, when not all, at least 75 percent of the equity interest in AJV; for a time, 20 or 25 percent was held by a close friend of Mr. Cadle. AJV is a Cadle family enterprise and an affiliate of TCC.

18. In the 1987 Joint Venture Agreement by which AJV was created, TCC is identified as the Managing Joint Venturer, and is the only entity so designated, and is entitled to a "Management Fee" in the amount of 25 percent of the net profit before any distribution is made to Joint Venturers. The Joint Venture Agreement specifies:

> The Joint Venturers have come together to purchase, on their joint bid, from time to time, pursuant to Asset Sale Agreements [14] ... from the Federal Deposit Insurance Corporation and/or the Federal Saving and Loan Insurance Corporation, assets (along with the appropriate documentation to support such purchases as set forth in the Asset Sale Agreements);

and

> The Asset Sale Agreement(s) whereby assets are purchased from the Federal Deposit Insurance Corporation and/or the Federal Saving and Loan Insurance Corporation shall be executed by the Cadle Company and/or Daniel C. Cadle on behalf of and for the benefit of this Joint Venture.

The Joint Venture Agreement further specifies:

> The Managing Joint Venturer shall have full authority to do all things deemed proper by it in the conduct of the business of the Joint Venture. The Managing Joint Venturer shall also have full authority, power, and discretion concerning the acquisition, management, servicing, exchange, or disposition of any of all of the assets of the Joint Venture.... The Managing Joint Venturer is the attorney in fact as agent of the Joint Venture to create, prepare, complete, execute, file, swear to, deliver, endorse and record any and all instruments, assignments, documents, and writings as may be necessary from time to time on behalf of the Joint Venture.

19. In 1989, TCC entered into an agreement entitled "Loan–Servicing Agreement" with AJV. Daniel Cadle, as president of TCC, signed the agreement for TCC; Daniel Cadle, as president of

---

12. TCC purchased the BTB notes at auction as part of a bulk sale of 27 loans. TCC was the high bidder, agreeing to pay approximately 14.142 percent of the book value of the loans in the package, which face value aggregated in excess of $2,160,516.16.

13. A schedule of investors attached to the AJV's Joint Venture Agreement puts the proportionate share of TCC in AJV at its inception at 20.289 percent. On December 29, 1994, the general partner and limited partners (by TCC as their attorney in fact) filed a "Certificate of Amendment of Certificate of Limited Partnership" which indicated that the interest of TCC in AJV was at that time just one percent.

14. Despite its capitalization, "Asset Sale Agreement" is not a defined by the Joint Venture Agreement.

TCC, as general partner of AJV, signed the agreement for AJV. The agreement appears to have continued in effect through the present, which is to say at all times relevant to the matters presently at issue.

20. Under the Loan–Servicing Agreement, TCC, as an independent contractor, agreed to act as manager of AJV and assumed responsibility for servicing the loans owned by AJV. With respect to management responsibilities, the Agreement states: "TCC is the manager for all business matters relating to AJV and is responsible for all management functions and decisions." With respect to servicing responsibilities, the Agreement obligates TCC to service the loans of AJV in all respects: record keeping and accounting, collection and remittance of payments, safeguarding of collateral, customer service, delinquency control, and litigation. Among other things, the Agreement obligates TCC to "deal quickly and effectively with delinquent Loan borrowers." It also specifies that "TCC shall initiate and consummate all litigation in the name of TCC and other acquisition procedures necessary to preserve the interest of AJV in all loan collateral."

21. The FDIC transferred the SCC & H notes to TCC by endorsement, and TCC thereby became the holder of the notes. Although AJV had advanced the funds with which TCC purchased the notes, TCC never transferred the interest it thereby acquired in the notes to AJV. Until, in October of 2002, Schlichtmann acquired TCC's interest in the notes at a Texas sheriff's sale, and except as modified by certain collateral assignments of the notes by TCC to a bank (as explained below), all legal title to the notes remained in TCC.

As between TCC and AJV, it was always understood that TCC was holding, servicing, and enforcing the notes for the benefit of AJV—and was obligated to do so—and that TCC was obligated by the above-described Joint Venture Agreement and Loan–Servicing Agreement to remit proceeds of the notes to AJV. Still, title to the notes remained at all times in TCC. Moreover, although the relationship of TCC to AJV with respect to the notes was similar in many respects to the relationship of a trustee to a beneficiary, no express trust was ever created, and TCC did not hold the notes as trustee. It held all legal and beneficial ownership in its own name. Daniel Cadle testified that it was the practice of TCC to transfer to the investor (here AJV) the "beneficial interest" in notes acquired by TCC with investor funding within a short time after they were purchased.[15] With respect to the SCC & H notes, no document evidencing any such transfer of beneficial interest was ever executed. For accounting purposes, AJV and TCC both have treated the "beneficial interest" in the SCC & H notes as belonging to AJV, not TCC. Nonetheless, TCC never transferred any interest in the notes to AJV, and therefore AJV had no property interest in the notes. At most, it had a complex of contractual rights against TCC, under the Joint Venture Agreement and Loan–Servicing Agreement, by which TCC was obligated to AJV to enforce and service the notes and to turnover the proceeds of the notes as these were collected. This right was enforceable by AJV against TCC, but it did not attach to or follow the notes. It was a complex of *in personam* rights against TCC and not a property interest in the notes. When the Respondents refer to the "beneficial interest" of

---

**15.** What Daniel meant by this is unclear. The details of such a transfer are not in evidence, and Daniel is not an attorney.

AJV in the SCC & H notes, it is this complex of *in personam* rights they are referring to, nothing more.[16]

### c. Collateral Assignments of Notes

22. On December 9, 1994, TCC and AJV, as borrowers, entered into a loan agreement with Mahoning National Bank ("Mahoning") to borrow $3,550,000 over a term of two years (the "1994 loan"). To secure the 1994 loan, TCC gave Mahoning a security interest in, and executed a collateral assignment of notes as to, certain promissory notes that it held for the benefit of AJV, including the $40,000 SCC & H note. Mahoning filed a UCC–1 financing statement as to this security interest. The collateral assignment stated: "It is expressly understood and agreed by the parties hereto that before default under the terms of the loan documents, Assignor shall have the right to collect the Collateral and profits therefrom, along with the right to retain, use and enjoy the same."

23. On June 5, 1996, AJV, as borrower, and TCC, as guarantor, entered into a second loan agreement with Mahoning to borrow $500,000 over a term of thirty months (the "1996 loan"). To secure the

1996 loan, TCC gave Mahoning a security interest in, and executed a collateral assignment of notes as to, promissory notes that it held for the benefit of AJV. Schlichtmann alleges, the Respondents agree, and therefore the Court finds that the promissory notes given as collateral for this loan include the SCC & H notes.[17] The collateral assignment stated: "It is expressly understood and agreed by the parties hereto that before default under the terms of the loan documents, Assignor shall have the right to collect the Collateral and profits therefrom, along with the right to retain, use and enjoy the same."

24. On March 10, 1997, AJV, as borrower, and TCC, as guarantor, entered into a third loan agreement with Mahoning to borrow $1,300,000 over a term of three years (the "1997 loan"). To secure the 1997 loan, AJV, but not TCC, gave Mahoning a security interest in, and executed a collateral assignment of notes as to, some 429 promissory notes, including the three SCC & H notes (among many others). Mahoning filed a UCC–1 financing statement as to its security interest under the 1997 loan, but it is unclear whether the financing statement included or referred to the SCC & H notes.[18] The collateral as-

16. In documents evidencing security agreements in which TCC and AJV pledged their respective "interests" in the SCC & H notes as collateral, and in financing statements filed in conjunction with these security agreements, the interests of AJV and TCC are characterized in various ways: "held by TCC for the benefit of AJV," "held by AJV," "[TCC] maintains a beneficial interest in various promissory notes in certain loan portfolios ... the title to which vests with [AJV]," and "AJV is the present owner." Another financing statement states "[TCC] has acted solely as agent, on behalf of [AJV], in acquiring the collateral described in Exhibits A through SS attached hereto. TCC's only interest in the described collateral is as General Partner of [AJV]." These characterizations were drafted by lenders' counsel, not TCC or AJV, and serve primarily to identify the collateral and

to ensure that the lender's security interest attaches to the underlying collateral despite the complexities of the relationship between TCC, AJV, and the accounts at issue. They effect no transfer of rights between TCC and AJV and have no relevance to a determination of the precise nature of the interests being pledged by TCC and AJV.

17. This is not apparent from the evidence. The security agreement and collateral assignment of notes both define the scope of the collateral by reference to an Exhibit A that was missing from the copies of the operative documents that were placed in evidence.

18. The financing statement itself is in evidence but describes the collateral by reference to an Exhibit A that was not attached to the copy in evidence.

signment stated: "It is expressly understood and agreed by the parties hereto that before default occurs under the terms of the Loan documents, Assignor shall have the right to collect the Collateral and profits therefrom, along with the right to retain, use and enjoy the same[.]"

25. The 1994, 1996, and 1997 loans were timely repaid. There is no evidence that any one of them was ever in default or that Mahoning ever exercised any rights under its security agreements as to the SCC & H notes.

26. In conjunction with the 1997 loan, TCC executed and gave to Mahoning, on or around March 10, 1997, a set of 46 allonges, each stating: "Pay to the order of Atlanta Joint Venture, an Ohio limited partnership, without recourse, representation or warranty. This Allonge shall have the same effect as though it appeared on the face of the note to which it is attached." Each is signed by Daniel Cadle as president of TCC. Also in conjunction with the 1997 loan, AJV executed and gave to Mahoning, on or around March 10, 1997, a second set of 46 allonges, each stating:

> "Pay to the order of The Mahoning National Bank of Youngstown ... without recourse, representation or warranty, as provided in that certain Loan Agreement dated as of March 10, 1997, by and between The Mahoning National Bank of Youngstown and The Cadle Company, an Ohio Corporation and Atlanta Joint Venture, an Ohio limited partnership, and as provided in the Loan Documents (as defined in the Loan Agreement). This Allonge shall have the same effect as though it appeared on the face of the note to which it is attached."

Each is signed by Daniel Cadle as president of TCC, as general partner of AJV. When TCC and AJV delivered their sets of allonges to Mahoning, the allonges were free standing, not attached to promissory notes. Both sets of allonges were delivered to Mahoning with the understanding that, if the loan went into default and Mahoning needed to exercise its rights under the security agreement as to one or more of the promissory notes given it as collateral under the 1997 loan, Mahoning would, in its discretion, attach allonges to one or more of the promissory notes given as collateral, to effect endorsement of the notes first from TCC to AJV and then from AJV to Mahoning. The Respondents contend that the allonges were intended for use only with a specific subset of the promissory notes given as collateral, known as the CC Emerald Equities notes, to which subset the SCC & H notes did not belong. Finding no evidence to suggest that their use was limited to any specific subset of the 429 collaterally-assigned notes, the Court finds that they were intended for use with any notes that Mahoning chose. Schlichtmann has adduced no evidence that Mahoning ever attached an allonge to one of the SCC & H notes or to any note.

### d. *Early Dealings: February 1991 to June 1995*

27. Daniel Cadle performed the due diligence involved in TCC's acquisition of the loan package containing the SCC & H notes from the FDIC. He also made the determination to bid on that package, and he did so primarily because of the presence of the SCC & H notes in the mix. After TCC's acquisition of the SCC & H notes, however, Daniel had no substantial role in the collection of the notes until August, 2002. Rather, from immediately after the acquisition, oversight and collection of the SCC & H account were handled for TCC by Daniel's brother, Cecil C. Cadle ("Cecil"), then vice-president of TCC.

Cecil oversaw the account until his death in December 1999 or January 2000.[19]

28. On February 14, 1992, shortly after TCC acquired the SCC & H notes, Cecil sent a letter on TCC letterhead to SCC & H, stating that TCC had purchased the firm's loan from the FDIC in liquidation of Boston Trade Bank. The letter stated: "If by chance you, any guarantors or any of the co-makers of the note have filed bankruptcy, please let us know so we can mark our records accordingly." On February 19, 1992, William Crowley sent Cecil a reply letter by facsimile transmission, on letterhead of Conway Crowley & Hugo, indicating that Schlichtmann had "been declared bankrupt by the U.S. Bankruptcy Court in Boston." TCC undertook no collection efforts against SCC & H, its partners, or the collateral until after it had so inquired and been informed about the possible bankruptcy of any obligor on the SCC & H account. TCC does not dispute that it had been notified of Schlichtmann's bankruptcy filing at least as early as February 19, 1992.

29. There is no evidence that any payment was made on the notes between TCC's acquisition of the notes in 1991 and the commencement of litigation in 1995.

30. Cecil Cadle had no communication with Schlichtmann in 1992. During that year and the next, Cecil Cadle communicated repeatedly with Schlichtmann's former partners, especially William Crowley, in an effort to obtain payment from them or from the assets of the former partnership. Crowley assured Cecil that the former partners acknowledged the debt. Crowley also repeatedly assured Cecil that there remained plenty of collateral, mostly in the form of contingent fees that had not yet matured, including the Groton fee, from which the debt to TCC might ultimately be paid. Crowley also told Cecil that the former partners, and their new firm of CC & H, had no cash with which they could then pay the debt. He explained that the only sources of payment were the still-outstanding contingent fees of SCC & H, of which there were several, and that the largest and surest of these was the Groton fee. Crowley explained to Cecil that the Groton settlement had already been approved, that the funds, including those ultimately destined for attorney's fees, were in escrow, that their distribution was assured, and that the distribution awaited only an approval by a state environmental agency. Crowley further explained that Schlichtmann was the one of the former partners now monitoring and wrapping up the Groton matter. Crowley implored Cecil to refrain from taking collection action and to await the Groton distribution; he also sought to negotiate a settlement with Cecil under which TCC would accept partial payment in satisfaction of the whole. Cecil always responded that he would not negotiate until Crowley had funds in hand about which to negotiate. He did not thereby mean or promise that he (Cecil) would negotiate when Crowley had funds in hand. And he never indicated that he would settle for anything less than payment in full. Cecil made clear, and Crowley understood, that Cecil (on behalf of TCC) claimed a security interest in the whole of the Groton fee, was demanding and expecting turnover as soon as the fee was paid, and was not con-

---

**19.** The record is unclear as to the precise date, but no sooner than December 15, 1999 and no later than January 6, 2000. In December, 1999, Cecil testified in the District Court trial in a civil action by TCC against Schlichtmann. He also gave a deposition in the same matter. His deposition and trial testimony have been admitted into evidence in the present proceeding by agreement among the parties. After Cecil's death, another account officer was assigned to the SCC & H account.

senting to the former partners' use of the fee for any purpose other than payment of TCC. Crowley kept Schlichtmann abreast of Cecil's communications with the former partners and of developments on that front.

31. Cecil first communicated with Schlichtmann in the early months of 1993; the precise date is unclear. In that instance, as in all subsequent communications between them through June, 1995, Schlichtmann initiated the telephone call.[20] They communicated only by telephone— not at all in writing, nor did either keep records of their communications—and they did so on only a few occasions before litigation erupted in June of 1995.

32. Schlichtmann contends that his first call to Cecil was precipitated by statements Cecil had made to Crowley and which Crowley had in turn relayed to Schlichtmann. Schlichtmann testified that Crowley had told him that Cecil had told Crowley that Schlichtmann had committed fraud in his bankruptcy case, that Schlichtmann is "not out of this yet," that Schlichtmann had taken over the Groton case, that this was a fraud, and that Cecil had been investigating Schlichtmann and had been asking questions over at the bankruptcy court about him. Schlichtmann contends that these statements by Cecil to Crowley were intended by Cecil to reach Schlichtmann, that they were threatening and intimidating, and that they were intended by Cecil to pressure Schlichtmann into paying on the debt discharged in bankruptcy. Cecil denied having made the alleged statements. Schlichtmann's testimony as to what Cecil told Crowley is hearsay and unreliable, and no independent evidence of these statements has been adduced.[21] Nor

have I evidence of the conversations and context in which the alleged statements were made. The Court therefore cannot find that Cecil made the statements Schlichtmann attributes to him, much less that he did so with intent that they be relayed to Schlichtmann in order to intimidate him into paying his discharged debt.

33. This first telephone conversation began with Schlichtmann expressing anger about what he understood to be Cecil's views: that the Groton receivable was TCC's collateral and that TCC was entitled to turnover of the full amount of the Groton fee upon its distribution. When Schlichtmann calmed down, Cecil confirmed that this was indeed his view: "It's my car. You drove off with my car." In substance and as Schlichtmann quickly understood, "You've got my collateral, and I want it." Cecil and Schlichtmann then argued about whether Schlichtmann was entitled to be compensated from the expected Groton fee for his post-bankruptcy efforts in the Groton matter, or whether the whole of the fee remained Cadle's collateral.

34. Schlichtmann contends that Cecil also said, in this conversation, "You didn't list it [the Groton fee receivable] in your bankruptcy schedules, and this is a fraud." I cannot find that Cecil said this in this conversation. Cecil did eventually learn that Schlichtmann had not listed the Groton receivable in his schedules, and upon so learning believed this was fraud, but probably not until 1997 or 1998, after Cecil and TCC had commenced discovery in litigation commenced by TCC against Schlichtmann and others.

20. Neither Cecil nor Schlichtmann could categorically rule out that Cecil had initiated a call, but neither had any specific memory of his having done so.

21. The record contains no testimony from Crowley.

35. For the balance of the first conversation, and after making no progress on his and Cecil's competing claims to the Groton fee, Schlichtmann changed tack and attempted to persuade Cecil not to pressure his former partners for payment but instead to wait for the Groton settlement. The details of this discussion, and of subsequent discussions in the same vein, are entirely unclear. Both Cecil and Schlichtmann contend that as a result of this conversation and of subsequent conversations over many months between and among Schlichtmann, Cecil, and Crowley, the three came to what they called an "understanding."

36. Schlichtmann and Cecil nonetheless differ markedly on the terms of their alleged understanding. No understanding was ever reduced to writing. Cecil testified that the understanding was as follows: if TCC did not take collection action against Schlichtmann's former partners, and refrained from seizing the proceeds of other smaller receivables that constituted TCC's collateral, TCC would be paid in full from the Groton receivable at the time of the second distribution. Schlichtmann testified to a different understanding: if TCC refrained from taking collection action against Schlichtmann's former partners, and refrained from seizing the proceeds of other smaller receivables that constituted TCC's collateral—and which Conway Crowley & Hugo desperately needed to stay in business—then, upon payment of the Groton fee, Schlichtmann's former partners would discuss a settlement with TCC.

37. For several reasons, I find they had no meeting of the minds at all and no agreement, nothing in the nature of a contract. First, neither Cecil nor Schlichtmann trusted the other, and both were experienced business people, Schlichtmann as an attorney and Cecil as a long-practiced collector of claims for TCC; had they had an agreement, they would most certainly have reduced it to writing. Second, both were well aware that Schlichtmann had received a discharge and therefore that any agreement between them would have to either meet the requirements of a reaffirmation agreement or skirt carefully around the discharge; both knew and understood that any arrangement between them that did not address these issues on paper was no agreement at all. Third, the record makes clear that Cecil had no intention to compromise regarding the SCC & H notes: it is inconceivable that he would have obligated himself to forbear, especially in exchange for a mere promise of negotiations at a later date.

38. In the District Court trial between TCC and Schlichtmann (described below), TCC maintained, for a time, that if Cecil and Schlichtmann did not actually enter into an agreement, then one could find, in the alternative, that (a) Schlichtmann promised Cecil that if TCC refrained from taking collection action against his former partners, then he would give TCC the whole of the Groton fee, or at least the portion thereof to which he was entitled, and (b) Cecil relied on this promise to his detriment. (This was the basis for the promissory estoppel theory that TCC advanced in that action.) The evidence does not rise to the level of establishing either (a) or (b). First, Schlichtmann surely urged Cecil to forbear and assured him in many ways and forms that, if he did forbear, TCC would be paid from the Groton fee, but it is unlikely, and surely not proven, that he quite promised to give TCC his share of the Groton settlement in exchange for his forbearance. Cecil may well have understood Schlichtmann to have so promised; Schlichtmann was telling Cecil anything he could to buy time for his former partners and to forestall legal action by

Cecil to seize the Groton fee.[22] Second, I find that, although Cecil did forbear from taking collection action against the former partners, he did not do so in reliance on Schlichtmann's promise or assurance. Cecil did not deem Schlichtmann trustworthy, and he knew that oral promises from Schlichtmann were unenforceable. In short, Cecil did not rely on Schlichtmann's promises and assurances. He did forbear, but for other reasons.

39. Cecil did stay his hand until the Groton proceeds were distributed in June, 1995: he took no action to seize the proceeds of other, smaller accounts receivable of SCC & H, allowing Schlichtmann's former partners to use them; and he took no action against Schlichtmann.

40. Cecil had reason to believe, and did believe in good faith at all relevant times, that by virtue of Schlichtmann's having taken control of the Groton litigation, Schlichtmann had taken control of TCC's collateral, SCC & H's rights under its contingency fee agreement to a share of the proceeds that were already being held in escrow in the Groton litigation. On the basis of extensive testimony by Cecil, both at trial and in deposition, it is clear to the Court that, at all relevant times from TCC's acquisition of the SCC & H notes until his death, Cecil was interested in Schlichtmann as the attorney having control of an asset of SCC & H, the Groton receivable, in which TCC had a security interest. Cecil had no interest in pressuring Schlichtmann to pay his discharged debt to TCC. Rather, his interest in Schlichtmann and the purpose of his conversations with Schlichtmann during this period—from TCC's acquisition of the notes in 1992 until and through the commencement of litigation in June 1995—was

clear and limited: to ensure that, upon release of the Groton settlement from escrow, Schlichtmann would honor TCC's security interest by turning over the Groton fee to TCC, to the extent necessary to satisfy SCC & H's debt on the notes.

### e. *The Credit Report*

41. In April 1993, Schlichtmann, while in the process of applying for a residential mortgage, was informed that one of the national credit reporting services had reported, on a report of Schlichtmann's credit, that Schlichtmann was obligated to TCC in the amount of $149,000, that this account had opened in February, 1992—the date is important because, if the debt in question arose after Schlichtmann's bankruptcy filing, it would appear not to be subject to his discharge—and that this debt was "in collection." In the language of credit reports, the term "in collection" means actively being collected by a person or agency whose job it is to collect a bad debt. In fact, Schlichtmann's debt to TCC originated before his bankruptcy filing, not in February 1992, and had been discharged, and TCC was not collecting it from Schlichtmann; therefore the debt was not "in collection." Schlichtmann immediately called Cecil to complain that the report incorrectly identified the debt as (a) originating in 1992 and (b) being in collection. Schlichtmann demanded that TCC submit a corrective report to the credit reporting agency to the effect that the debt had been discharged in bankruptcy. According to Schlichtmann, Cecil assured Schlichtmann that he would do so. From the fact that Schlichtmann has not made allegations or produced evidence to the contrary, the Court finds that Cecil and TCC addressed the problem to Schlicht-

---

**22.** Cecil testified credibly that he tried for years to find out who Schlichtmann's clients were in the Groton action, and Schlichtmann consistently concealed that information from him.

mann's satisfaction. Schlichtmann did not go forward with the mortgage transaction, but for reasons other than the credit report. He was not denied a mortgage loan on account of the credit report. Nor was Schlichtmann otherwise damaged by the report. In fact, Schlichtmann testified that he never even checked to see whether the credit report had been corrected.

42. Credit Reporting Bureau, Inc. ("CRB") was a small business, based in Attleboro, Massachusetts, that prepared residential mortgage credit reports for lending institutions who were considering consumers for residential mortgages. In April 1993, CRB was retained by Plymouth Mortgage Company of Danvers, Massachusetts to prepare a residential mortgage credit report in conjunction with Schlichtmann's mortgage application. William Saunders, who in 1993 had been the office manager of CRB, testified in the 1999 District Court trial that CRB first obtained the information that the Cadle debt was "in collection" from a credit report issued by one of the three major credit reporting services.[23] He also testified that an employee of CRB (not Saunders himself) called TCC in April 1993 to verify that the information in the report was accurate, and that an employee of TCC, whom Saunders could not identify, did verify the reported information, including that the account opened in 1992 and was properly rated I–9, which meant "in collection."

43. Schlichtmann contends that the credit report contained the false information about Schlichtmann's account—that the debt originated in 1992 and was in collection—because TCC had sent this information to one of the three major credit

reporting services, and I so find. Although the Court has little evidence as to precisely how the information in the credit report made its way to the credit reporting service—and such evidence as I have may at best be characterized as guesswork by Cecil and Daniel Cadle—I find that it originated in a report from TCC. I do so for two reasons: first, because it is improbable that a credit reporting service would have obtained that information without a report from TCC; and second, because the evidence shows that upon inquiry by an employee of CRB, an employee of TCC verified precisely the information that CRB had first found in a report of one or more of the major credit reporting services, including that the debt was "in collection." I further find that the information transmitted by TCC to the credit reporting service included the information that the account was opened in 1992 and was in collection.

44. Schlichtmann further contends that TCC's issuance of the false credit information to a credit reporting service was an act calculated to pressure him to pay on a debt that had been discharged in bankruptcy. I construe this as an allegation that the report of the false information was made by an agent of TCC with intent thereby to pressure Schlichtmann into paying his discharged debt. I find no evidence to support this allegation and find it more likely than not that the erroneous information was a result of mistake or negligence, not of intent to pressure or intimidate Schlichtmann into paying a debt. First, in the early years of this loan, only Cecil had responsibility within TCC for the SCC & H notes, but Cecil testified credibly that he did not send this informa-

---

**23.** The evidence shows that the information in question was reported by at least one of the major credit reporting services, but Saunders did not specify which, or how many, of the

three. Nor has the report been admitted into evidence. The evidence includes only a derivative report prepared by CRB for Plymouth Mortgage.

tion to a credit reporting service and was unaware that TCC had sent any information; and he corrected the problem as soon as it was brought to his attention. Second, Schlichtmann has submitted no evidence as to how the information was obtained by the credit reporting service; notably, he produced no witness or evidence from the credit reporting service as to how, when, or from whom the information was obtained. Third, and on the basis of testimony by Daniel Cadle, it is likely—or, more precisely, more likely than any alternative explanation—that the information was transmitted, in the first instance, by TCC as part of a routine and periodic transmission of a batch of computerized data, each concerning many hundreds of accounts, by TCC to a reporting service. Fourth, the record contains no evidence as to the personnel and procedures at TCC that were involved in the gleaning and input of the erroneous data that was transmitted in this batch. Fifth, although there is evidence that an employee of CRB called TCC in April 1993 to verify that the report was accurate, and that someone at TCC did verify that the account was then listed in TCC's own records as opened in 1992 and in collection, there is no evidence as to who at TCC made that verification and why they did so. Cecil denied, credibly, that he had been contacted about a credit report; and, on the basis of testimony by Daniel Cadle, I find it unlikely that such an inquiry would have been referred to Cecil. Sixth, it is easy to imagine innocent reasons why someone at TCC may have categorized the account as originating in 1992 and in collection: the account was acquired by TCC in 1992; and, as to SCC & H, the collateral (which was in Schlichtmann's control), and three of the guarantors (albeit not Schlichtmann), the SCC & H notes were indeed in collection. For these reasons, I cannot find by clear and convincing evidence that TCC's report that the debt originated in 1992 and was in collection was an attempt to collect a debt.

### f. 1995: The Fee is Distributed, and TCC Files Suit

45. Under the 1991 settlement agreement in the Groton litigation, the second distribution was contingent upon and subject to approval of an on-site remediation plan by the Massachusetts Department of Environmental Protection ("DEP"). Had the DEP insisted on a remediation effort that included also off-site efforts, the defendants would have had no obligation to distribute the second fund. Obtaining approval of a remediation plan that was limited to on-site efforts would require the cooperation of the Groton plaintiffs and of Schlichtmann as their counsel; in fact the settlement was designed to give them a financial interest in so cooperating. As it turned out, the DEP never did approve an on-site remediation plan. Rather, at some point after the date of the settlement agreement, the relevant Massachusetts environmental regulations were changed in such as way as to make literal compliance with the terms of the agreement infeasible or impossible. To address this change, on May 18, 1995, Schlichtmann, on behalf of the Groton plaintiffs, negotiated and entered into a letter agreement with one of the Groton defendants. By the agreement, a new and similar contingency was substituted for the old:

> The parties agree that submission to the Massachusetts Department of Environmental Protection ("DEP") of a Response Action Outcome Statement signed by a licensed site professional ... which provides that the sole appropriate and necessary remedy for the Conductorlab Property and any and all contamination allegedly on or arising from the Conductorlab Property consists of On–Site Remediation

Activities, without any Off–Site Remediation Activities, equivalent of [sic] receiving a written determination from the DEP as provided in ... the Settlement Agreement.

The Court has no evidence as to precisely when this alternate contingency was satisfied, but the letter agreement did lead to release of the second Groton settlement fund from escrow in short order.

46. Schlichtmann played an important and crucial role in satisfying the conditions required for release of the second distribution. Despite the testimony of the Groton defense attorneys, however, his precise role remains very unclear. Moreover, the extent of his role, in terms of time invested, or in relation to the amount of time he invested in the Groton matter before the 1991 settlement, or before his bankruptcy filing, or before his departure from SCC & H, is nowhere in evidence.

47. In June 1995, counsel for the Groton defendants, as escrow agent, released the funds to Schlichtmann, as plaintiffs' counsel. Of this second distribution, $300,000 constituted the balance of the contingency fee payable to plaintiffs' counsel in the matter. Of this $300,000, Schlichtmann, on June 28, 1995, paid $100,000 to the firm of Conway, Crowley & Hugo, P.C., which, on the next day, paid $49,698.39 thereof to its landlord for long overdue rent and paid draws of $6,000 each to Messrs. Conway, Crowley, and Hugo, leaving a balance of $32,301.61 in the coffers of the firm. Schlichtmann promptly paid the remaining fee of $200,000 to himself and, from that portion, paid $110,000 to attorney Thomas Kiley. Neither Schlichtmann nor Conway, Crowley & Hugo, P.C. turned any portion of the fee over to TCC.

48. In conversations with Cecil in May and June, 1995, Crowley had notified Cecil that the second distribution would soon be paid. Cecil caused TCC to retain counsel, the Massachusetts firm of Doonan & Graves, and by counsel to file a complaint on June 29, 1995, in the United States District Court for the District of Massachusetts. The initial complaint, which is not in evidence, named only five defendants: SCC & H and Messrs. Schlichtmann, Conway, Crowley, and Hugo. With the complaint, TCC filed a motion for a temporary restraining order. On June 30, 1995, the District Court entered a temporary restraining order and, after a hearing on June 12, 1995, a preliminary injunction. The preliminary injunction enjoined defendants Kevin Conway, William Crowley and Michael Hugo from disbursing any part of the Groton fee received by them until further order of the court. It does not appear that any injunctive relief was entered against Schlichtmann. As the motion for temporary restraining order is not in evidence, it is impossible to determine what relief, if any, it sought against him.

49. In a conversation between Schlichtmann and Cecil, shortly after the preliminary injunction hearing, Schlichtmann was again incensed that Cecil and TCC would take the position—and now make it the basis of their District Court suit against him—that TCC had been entitled to the whole of the Groton fee, this despite his having heard Cecil articulate the position on several occasions since January 1993. In that conversation, Schlichtmann told Cadle: "Mr. Cadle, it appears you want to get into a morass of litigation, and it looks like this is going to go on for a very, very long time." When Respondents' counsel asked Schlichtmann whether this had been a threat, he denied that it had been, but not persuasively.

50. By leave of court, TCC filed a first amended complaint on September 11, 1996 and a second amended complaint on April 28, 1997. As against Schlichtmann, the

amended complaints were essentially identical, each stating only two counts against him: one to reach and apply proceeds he had received from the Groton legal fee, on the basis that such proceeds were subject to TCC's security interest, originally given by SCC & H to TCC's predecessor in interest; and a second for conversion, on the basis that he had received and, despite demand, failed to turnover the Groton legal fee, which was subject to TCC's security interest. Although the complaints sought relief against SCC & H and Schlichtmann's former partners for their liability on the SCC & H notes and the guarantees thereof, TCC was careful to specify in both that no such relief was being sought against Schlichtmann.

51. With his answer to the first amended complaint, Schlichtmann filed a counterclaim against TCC, stating two counts. The first alleged that TCC's prosecution of the District Court complaint against him was a violation of his bankruptcy discharge. The second alleged that TCC's assertion of a security interest in the Groton receivable was unfounded and therefore an unfair business practice, knowingly and willfully committed, in violation of Massachusetts G.L. c. 93A, § 11, for which Schlichtmann demanded treble damages. Notably, Schlichtmann's counterclaim for violation of the discharge sought damages only for prosecution of the District Court action, not for two other alleged violations of the discharge for which he now seeks relief and which had by then occurred (or allegedly occurred): the credit report and Cecil's allege threats to expose Schlichtmann for bankruptcy fraud.

### g. *1998: TCC Instigates Inquiry*

51. In late February or early March of 1998, while discovery was still proceeding in the District Court action, TCC's Attorney, John Doonan, communicated with the trustee in Schlichtmann's bankruptcy case, Ellen Carpenter, to state that TCC believed that Schlichtmann had failed to disclose certain assets in his bankruptcy schedules and statement of financial affairs. Specifically, Doonan indicated that Cadle alleged (a) that Schlichtmann had received a fee of $230,000 within six months of his filing which was not disclosed and (b) that Schlichtmann had failed to disclose that he was entitled to receive an additional fee of $265,980. Doonan also supplied Carpenter with documents regarding the disputed fees.

53. When she received this communication from Doonan, Carpenter was representing TCC in a separate and unrelated matter, and she had earlier represented TCC in two other matters. All three matters she handled for TCC commenced after Schlichtmann's bankruptcy case had been closed. In the course of her representation of TCC, no one from TCC had ever discussed the Schlichtmann case with her. However, by virtue of her obligations to TCC in these other matters, she understood that she was no longer disinterested, that she could no longer serve as trustee in Schlichtmann's bankruptcy case, and that it would be inappropriate for her to investigate TCC's allegations. Therefore, on March 11, 1998, she sent a letter to J. Christopher Marshall, who was then the United States Trustee for this region. Among other things, Marshall oversaw the panel of trustees in chapter 7 cases in the District of Massachusetts. In the letter, Carpenter related TCC's allegations and attached the documents Doonan had given her. Indicating that she had also spoken to Schlichtmann about the allegations, she also set forth his response: that he had not been obligated to disclose either payment, the earlier because it had been received and distributed well before his bankruptcy filing, and the latter because contingencies to be met prior to payment

meant that he had not been entitled to it at the time of his bankruptcy filing. Finally, after explaining that she was no longer disinterested and would not be qualified to serve as trustee, she asked Marshall to appoint another trustee to review TCC's allegations and to determine whether any further action was required. Carpenter sent copies of the letter to Doonan and Schlichtmann.

54. On March 17, 1998, just six days after Carpenter transmitted her letter to the U.S. Trustee and a copy to Schlichtmann, Cecil personally faxed a note to Schlichtmann, stating:

> I will participate in further settlement talks with you if you fax to me an agreement that nothing either of us talks about shall be disclosed to others unless we reach a written agreement signed by you and I. You, of course, still have permission of John Doonan to speak directly with me. All issues and all parties release are open for negotiation.

No evidence was submitted that Schlichtmann responded to this communication or that Cecil ever communicated with Schlichtmann again about settlement. It was Cecil's practice to handle all settlement discussions himself, never through counsel.

55. On March 24, 1998, and in relation to the inquiry requested by Carpenter at Doonan's behest, Doonan sent a letter of his own to the Office of the United States Trustee, with copies to Cecil and Schlichtmann, in which he reiterated and expanded upon the allegations he'd made to Carpenter. In the letter Doonan alleged, with reference to supporting evidence, (a) that, as of the date of Schlichtmann's bankruptcy filing, the Groton settlement was final; (b) that the second distribution was certain and contingent only on state approval of the defendants' on-site remediation plan,

not on any action or negotiations by the plaintiffs or Schlichtmann as their attorney; (c) that Schlichtmann's post-bankruptcy actions in obtaining the second distribution were limited; and (d) that "[o]ur conversations with several of the *Groton* defense attorneys have confirmed the finality of the settlement and the limited actions of Mr. Schlichtmann in 'obtaining' the second distribution." Doonan appended to the letter a list of five attorneys who had served as counsel for the defendants in the Groton matter; however, Doonan nowhere specified to which of these attorneys he had spoken. In closing, Doonan stated that he and his client were bringing these matters to the attention of the United States Trustee because it was important to the outcome of several key issues in TCC's civil litigation with Schlichtmann. "In this regard my client requests that your office articulate the rationale behind its decision, and that you disclose the information considered in reaching your conclusions.... This will prevent the decision to reopen or not to reopen this matter from being misconstrued in other contexts."

56. In response to the letters by Carpenter and Doonan, Schlichtmann himself contacted the United States Trustee to explain his side of the matter. He also adduced evidence in his own defense, including an affidavit from his bankruptcy attorney, Joseph Schindler, and affidavits from the five Groton defense attorneys whom Doonan had listed in his letter.

57. In response to the letters by Carpenter and Doonan, the United States Trustee's office undertook an investigation in which, among other things, it interviewed Doonan and Schlichtmann and considered the evidence and materials each had adduced. On October 27, 1998, the United States Trustee, Christopher Marshall, sent a letter to Carpenter with cop-

ies to Doonan and Schlichtmann, stating that after an investigation, "we do not believe we have sufficient information at this time to move to reopen this case and ask the court to appoint a new trustee.... [P]ending new information we do not intend to initiate reopening this case." This letter was Marshall's final pronouncement on the matter. It detailed no reasons for the decision announced therein.

58. In his letter to the United States Trustee, Doonan had represented that "[o]ur conversations with several of the *Groton* defense attorneys have confirmed the finality of the settlement and the limited actions of Mr. Schlichtmann in 'obtaining' the second distribution." This representation was false. Reneau Langoria is the attorney from Doonan's firm who contacted the Groton defense attorneys; she had contacted four of the five listed attorneys. Two of these had told Langoria that, with the 1991 settlement agreement, their involvement in the Groton matter had come to an end, and therefore that they had no personal knowledge of the extent of Schlichtmann's continued involvement thereafter. The third attorney, Michael Leon, told Langoria that he was aware that Schlichtmann had played an active role after approval of the settlement agreement, in the DEP approval process. He also told Langoria that Attorney Jane Wasman would be the most knowledgeable attorney concerning Schlichtmann's involvement after approval of the settlement agreement. The fourth attorney, Allen Kezsbom, told Langoria that DEP's approval of the on-site remediation plan had been very uncertain, that Schlichtmann had been actively involved in obtaining that approval, and that Attorney Jane Wasman would be the most knowledgeable

attorney concerning Schlichtmann's involvement after approval of the settlement agreement. Each of the four attorneys stated, and I find, that Doonan's statement to the United States Trustee—that the attorneys had confirmed that Schlichtmann's actions in obtaining the second distribution had been "limited"—was not an accurate or appropriate characterization of what he or she had reported to Langoria. Langoria never contacted Jane Wasman, but probably only because Wasman was out of the country at the time.[24] In view of the fact that none of the attorneys had confirmed that Schlichtmann's role had been limited, and that TCC offered no explanation for the discrepancy between the letter and the truth, I conclude that Doonan's misrepresentation was knowing.

59. In contacting Carpenter and sending the letter to the United States Trustee, Doonan was acting on behalf of TCC and with Cecil's knowledge and authorization. Cecil denied he had authorized or known that Doonan had contacted Carpenter or sent the letter, but his testimony is flatly incredible for several reasons. First, Doonan himself repeatedly indicated in the letter that he was acting on behalf of his client (*e.g.*, "My client regrets having to bring this matter to your attention." And "my client requests ...."). Second, when asked at trial whether Cecil had authorized the letter, Doonan did not deny that he had but stated only that the letter spoke for itself; in view of the contents of the letter, I construe Doonan's answer as meaning that Cecil had authorized it. Third, Doonan sent a copy of the letter to Cecil. Fourth, Assistant United States Trustee John Fitzgerald, to whom Marshall had assigned this matter, understood,

---

**24.** Wasman's affidavit was not admitted into evidence in the District Court action. Therefore, although Schlichtmann included it among his exhibits, it is excluded in this proceeding as well. Allan Keszbom testified that Wasman had told him that she had not been contacted by Langoria, and that testimony was admitted without objection.

after later discussing the matters in the letter with Doonan, that Doonan was acting for TCC. And fifth, in view of the potential consequences of this letter for TCC's action against Schlichtmann,[25] Doonan should not and would not have undertaken to send the letter without his client's prior approval. I find with a high degree of certainty that Cecil knew of and authorized Doonan's sending of this letter and of his earlier communication with Carpenter.

60. Schlichtmann alleges that Doonan's communication with Carpenter and his subsequent letter to the United States Trustee were part of a malicious effort by TCC, based on fabricated evidence, to pressure and coerce Schlichtmann to pay TCC on the discharged debt. The Court finds as follows. First, and to reiterate, Doonan's communication with Carpenter and his subsequent letter to the United States Trustee were authorized by Cecil and therefore by TCC; they were acts of TCC. Second, this attempt by TCC to instigate an inquiry was intended by TCC to serve several purposes: to obtain a determination as to whether Schlichtmann, as debtor, had hidden assets and made misrepresentations in his schedules and, if so, whether his case should be reopened to seek to revoke his discharge and possibly to recover for the estate any assets not disclosed (or the value thereof) for distribution to creditors; to assist in obtaining discovery from Schlichtmann;[26] and, not least, to pressure Schlichtmann into settling the claims asserted by TCC against Schlichtmann in the District Court action. Third, though Doonan's letter included a misrepresentation about what the Groton defense attorney's had told Langoria, TCC had good faith reasons to believe that Schlichtmann had made, or at least may have made, misrepresentations in his schedules about the Groton fee.

61. Fourth, it is unclear whether TCC's instigation of this inquiry was an attempt to collect not merely TCC's conversion claim against Schlichtmann but also TCC's discharged debt. There are reasons to suspect that it was: (a) TCC's instigation of the inquiry was designed to and did communicate to Schlichtmann that his discharge was vulnerable, subject to attack and possible vacatur; (b) in his fax regarding settlement discussions, Cecil had insisted on a confidentiality agreement and stated that "all issues" were open for negotiation; and (c) Cecil's denial that he was behind this attempt to instigate an inquiry could be evidence of a guilty conscience, evidence that in this particular tactic he had stepped over a line.[27] Still, these are

---

25. Among other things, the action might have lead to the reopening of the bankruptcy case and to an action by the Chapter 7 trustee to recover at least some portion of the previously undisclosed receivables *for the bankruptcy estate.* This would have (a) conflicted with TCC's claim of a property interest in some portion of the second distribution, the very property interest on which its conversion claim was predicated, and (b) created a second plaintiff, competing with TCC to recover scarce funds from Schlichtmann. The investigation triggered by the letter also had the potential to delay resolution of the District Court action in any number of ways.

26. Doonan's letter to the United States Trustee indicated a hope that the United States Trustee's inquiry would result in the production of evidence that TCC had been unsuccessful in obtaining from Schlichtmann and the other District Court defendants.

27. Throughout his extensive testimony in the District Court action and in his deposition, Cecil showed no qualms about his communications with Schlichtmann, his attempts to recover the Groton receivable, and his action against Schlichtmann for conversion of that receivable. He openly and consistently maintained that these were actions to enforce its property rights as to the Groton receivable, not an action on a discharged debt. Only with this effort to instigate an inquiry does Cecil attempt to hide his and TCC's involvement.

grounds only for suspicion and do not amount to clear and convincing evidence. Settlement discussions are often conducted under conditions of confidentiality. "All issues" is hardly a clear indication that inappropriate issues would be addressed, especially in litigation involving counterclaims and multiple defendants; Cecil did in fact enter into and consummate a settlement in the following months with the other defendants in the action. The vulnerability of Schlichtmann's discharge was not an unfounded allegation but simply a fact of life, given Schlichtmann's nondisclosure of the fee and the uncertainty (at that time and still today) regarding the timing of the transfer of rights from the SCC & H to Schlichtmann and regarding the extent to which the second distribution may have been earned before the bankruptcy filing; and TCC, as a creditor whose debt had been discharged in a case without assets for distribution, had good cause and standing to raise these issues on their own merits. And Cecil's denials may be evidence of a guilty conscience, but they are far from clear evidence. More importantly, I have no evidence of any actual demand by Cecil during this period for payment from Schlichtmann in any specific amount, much less an amount that exceeds what TCC could reasonably hope to obtain as a judgment on the conversion claim. Cecil was pressuring Schlichtmann to settle the conversion claim; the allegation that he was pressuring Schlichtmann to pay something more remains conjecture.

**h. *1997–2001: District Court Action— Pretrial Matters, Trial, Judgment, and Appeal***

62. As of December 11, 1998, no payments had been made on the SCC & H notes, and the total due was $480,236.46. On December 31, 1998, TCC and all defendants other than Schlichtmann and Kiley filed a stipulation of dismissal in the District Court action. The terms of TCC's settlement with these other defendants are not in evidence. The record contains evidence of only one payment on the SCC & H notes after December 11, 1998, a $20,000 payment from Kevin Conway (paid by a check from his firm, Conway, Crowley & Homer, P.C.), dated December 27, 2000. It is likely that other payments were made pursuant to the settlement agreement: Daniel Cadle testified that the three guarantors (other than Schlichtmann) paid "maybe $75,000 each or—or some amount, I don't remember what—on their personal guarantees." I have no further evidence of when or in what amounts these payments were made.

63. On May 2, 1997, Schlichtmann and Kiley filed a joint motion to dismiss or for summary judgment; TCC opposed the motion, and the Court denied it on October 8, 1997. On March 2, 1998, Schlichtmann and Kiley filed a second motion for summary judgment, and on April 6, 1998, Schlichtmann and Kiley filed a motion to strike TCC's pleadings and to dismiss its claims. Both motions were opposed by TCC and, on November 2, 1998, denied by the court. Schlichtmann has adduced no evidence of the substance of these motions or of the arguments asserted by TCC in opposition to them.

64. On December 31, 1998, Schlichtmann and Kiley filed yet another joint motion for summary judgment on TCC's claims for relief against them. TCC opposed the motion and filed a cross-motion for summary judgment on the same claims. In its cross-motion, TCC sought a determination that its perfected security interest in the entire Groton fee continued notwithstanding the dissolution of the SCC & H partnership and notwithstanding that Schlichtmann performed work on the case postbankruptcy. The District Court denied both motions, holding that TCC's se-

curity interest extended to only so much of the Groton fee as had been earned by SCC & H before it dissolved; Schlichtmann himself, as an independent practitioner, earned and was entitled to the balance. Because the agreed facts did not permit a determination of whether the actual distribution of the proceeds (two-thirds to Schlichtmann and one-third to his former partners) reflected the relative contributions of Schlichtmann and the firm, both motions had to be denied.

65. In the memorandum and order by which it denied the cross-motions for summary judgment, the District Court noted that only two of TCC's claims in that action remained unresolved: the conversion count against Schlichtmann; and a count against Kiley to reach and apply sums paid by Schlichtmann to Kiley. It would appear, then, that TCC's reach and apply count against Schlichtmann (not the reach and apply count against Kiley) had by then been dismissed. When and how that dismissal occurred is entirely unclear; I find no record of it on the docket of the District Court action.

66. Over ten days in November and December, 1999, the District Court conducted a jury trial on TCC's conversion claim against Schlichtmann. At the start of the trial, the court dismissed TCC's only other remaining count, the reach and apply against Kiley. The court also ruled that Schlichtmann's counterclaims would not be tried to the jury, that the conversion count would be tried first, and that the court would decide the counterclaims afterwards.

67. At the commencement of the trial, the conversion count proceeded on an "apportionment theory." Consistent with the ruling of the District Court on the cross-motions for summary judgment, the conversion count turned on the proper apportionment of the $300,000 fee between the predissolution efforts of SCC & H and the postdissolution efforts of Schlichtmann as a sole practitioner. TCC would be entitled to maintain a conversion action only as to that portion of the fee that was properly apportioned to the predissolution work of SCC & H. Accordingly, at the commencement of the trial, TCC's efforts and theory of the case were consistent with and limited to this apportionment theory.

68. During the trial, however, two further theories arose. Under the second theory, the contract theory, TCC could establish a right to the whole of the fee by proving that Schlichtmann had promised to turnover his full share to TCC upon its distribution in exchange for a promise by TCC to refrain from taking collection action against Schlichtmann's former partners, and that TCC had refrained from such collection action as promised. The third theory, the promissory estoppel theory, was a variation on the second: TCC could establish a right to the whole of the fee by proving that Schlichtmann had promised to turnover his full share to TCC upon its distribution if TCC refrained from taking collection action against Schlichtmann's former partners, and that TCC relied on that promise to its detriment. In the view of the District Court, neither theory was an alternative to conversion; both were merely alternate ways of establishing the property interest that is a necessary element of conversion. In colloquy concerning the jury charge, the court stated: "I'm not submitting a breach of contract claim on behalf of the plaintiff to the jury. It is a conversion claim. It will involve some contract principles to find that the property lay in the place that the plaintiff needs to have it . . . lie."

69. The contract and promissory estoppel theories formed no part of TCC's prosecution of the District Court action until the fifth day of trial. On that day, Schlichtmann himself (not TCC) elicited

from Cecil, on cross-examination, the testimony that constitutes the evidentiary basis for these theories. And the court (again, not TCC) first recognized this evidence as constituting a basis for a new theory of recovery, specifically the contract theory. At the same time, the court ruled that the apportionment theory of the case was dead, TCC having failed to adduce evidence on which a jury could find in its favor. Therefore, from that point on, the trial of the conversion count rested entirely on the contract theory. Through this point, TCC played no role in introducing the contract theory at all. Nonetheless, in redirect examination of Cecil, Doonan briefly elicited further testimony in support of the theory. And, near the conclusion of the trial and before the matter went to the jury, TCC submitted proposed jury instructions on the contract and promissory estoppel theories.

70. The court instructed the jury only on the contract theory and denied TCC's request for an instruction on promissory estoppel. The Court also instructed the jury that, for lack of evidence as to apportionment, TCC could not prevail on the apportionment theory: "there is no basis for which it could be judged that the division of the fee, one-third to the former partners and two-thirds to Mr. Schlichtmann, was not an appropriate division in consideration of their respective contributions." The jury was essentially instructed that they were to decide the conversion count on the strength of the contract theory alone. In view of the fact that the case was being submitted to the jury on the contract theory alone, Schlichtmann had moved (just prior to submission to the jury) for a directed verdict. In support of this motion he argued that the contract that formed the basis of the theory was, in essence, a reaffirmation agreement that could not be valid because there was no evidence that the requirements of 11

U.S.C. § 524(c) had been met as to the contract. The court denied the motion, stating without elaboration, "it remains my conclusion that there is a version of the evidence that would permit the jury to find a valid post-discharge undertaking supported by adequate consideration that could have shifted the property interest in the second-phase Groton fee entirely to the former partners and therefore made it subject in its entirety to the security interest held by the plaintiff."

71. TCC also demanded a jury instruction on the tort of fraud; the court denied the request.

72. On December 16, 1999, the jury returned a unanimous verdict for Schlichtmann on the conversion count.

73. On January 6, 2000, the court held a pretrial conference regarding Schlichtmann's counterclaim. The pretrial conference was notable for three developments. First, the court took notice that Cecil Cadle had died. The precise date was not specified, but presumably sometime after return of the verdict. (Cecil had testified in the action on December 15, 1999.) Second, Doonan indicated (a) that "there are certain memos that are covered by the attorney-client privilege that Mr. Cadle had sent to me concerning the ... letter that I sent to the U.S. Trustee's office," (b) that there was a strong likelihood that Doonan would be a witness in the counterclaim phase of the trial, and (c) that TCC would likely be retaining new counsel to try that next phase. Third, the court announced its view that redress for violation of a bankruptcy discharge, which was the subject of the first of Schlichtmann's two counts in counterclaim, could be had only in contempt proceedings in the bankruptcy court (unless the reference of the bankruptcy case to the bankruptcy court were withdrawn). The court further indicated

that this would necessitate an amendment of the counterclaim and, if the matter were to be tried in the District Court, possibly a motion for withdrawal of the reference as to Schlichtmann's bankruptcy case. In response, Schlichtmann did initially file a motion to amend his counterclaim, but later he moved to dismiss the counterclaim without prejudice,[28] and the court allowed his motion.

74. Accordingly, on February 22, 2000, the court entered judgment for Schlichtmann on the conversion count and dismissed the counterclaims "without prejudice through stipulation of the parties."

75. By new counsel, Scott L. Machanic, TCC timely filed a notice of appeal. On appeal, TCC made two arguments. First, TCC argued that the trial court had erred in failing to address the jury, as requested, on the elements of promissory estoppel, where the evidence permitted a finding that the plaintiff had withheld collection efforts in reliance on repeated promises by Schlichtmann that TCC would be satisfied from the Groton proceeds. Second, TCC argued that the trial court had erred when, on cross-motions for summary judgment, it had ruled that TCC's security interest did not extend as a matter of law to the entire Groton fee.

76. On July 19, 2001, the Court of Appeals, on the strength of the latter argument alone and without reaching the former, reversed the judgment below and remanded for further proceedings. Schlichtmann petitioned the Court of Appeals for panel rehearing or hearing en banc. On October 4, 2001, the Court of Appeals vacated its original judgment, withdrew its original opinion, and issued a substitute opinion (published at 267 F.3d 14) and a new judgment (to the same effect as the original) but denied the petition for rehearing or hearing en banc. Schlichtmann then petitioned the Court of Appeals again for panel rehearing or hearing en banc, and this petition too was denied. He then filed a petition in the Supreme Court for writ of certiorari, and that petition was denied. *Schlichtmann v. Cadle Co.*, 535 U.S. 1018, 122 S.Ct. 1607, 152 L.Ed.2d 622 (U.S. Apr. 22, 2002). All references in the present memorandum of decision to the opinion of the Court of Appeals are to the opinion issued on October 4, 2001.

77. The Court of Appeals held that TCC held a security interest in the entire Groton fee:

> [T]hat the post-dissolution work on the Groton matter was performed by Schlichtmann does not alter Cadle's rights as a secured creditor. Partners cannot eliminate a security interest in the partnership's anticipated fees by transferring (without the creditor's written consent) the client files, whether by dissolution of the partnership or otherwise.

*Cadle Co. v. Schlichtmann*, 267 F.3d at 18. The court further held that Schlichtmann was nonetheless not liable in conversion for the $100,000 he distributed to his former partners because TCC had not given notice of its claim to Schlichtmann before he made this distribution,[29] and that Schlichtmann was liable in conversion for the amount he retained and the amount he paid to Kiley before having received notice of TCC's claim. Because it was not clear

28. The motion is not in evidence.

29. The court stated: "[i]t appears ... that Cadle did not give notice of its claim to the fee distribution until after Schlichtmann had received the $300,000 and paid $100,000 to the other members of the former firm and (perhaps) shared a portion of it with Kiley." The court did not indicate the basis for this statement.

whether, or to what extent, the payment to Kiley was made after Schlichtmann received notice of TCC's claim, the matter was remanded to the District Court to make that determination and to enter judgment for TCC in the appropriate amount. The court did not address the promissory estoppel issue.

### i. *2002: Proceedings in Bankruptcy Court*

78. Before proceedings upon remand could resume in the District Court, Schlichtmann, on February 11, 2002, filed a motion in his bankruptcy case in which asked the Bankruptcy Court to (1) order TCC to show cause why it should not be held in civil and criminal contempt of the his discharge order; (2) after a hearing, award him compensatory damages, attorney's fees and costs, and punitive damages for TCC's violations of the discharge; (3) enjoin TCC from further prosecuting the District Court action against him; (4) enjoin TCC from asserting any lien or interest in any fees he received in the Groton matter; (5) enjoin TCC from taking any other action in violation of the discharge;

and (6) reopen the bankruptcy case in order to adjudicate these matters.

79. TCC, appearing by Scott Machanic, filed an opposition to the motion. Schlichtmann contends that, in this opposition, TCC, through attorney Machanic,

> made repeated references to the fact that Cadle was the "secured party"; "holds a security interest in the firm's accounts receivable"; "the attorney fee that was being pursued by The Cadle Company *was the property of the Cadle Company*"; and that Schlichtmann had "converted *The Cadle Company's asset.*" [30]

The clear meaning of this pleading, Schlichtmann contended, "was that the security interest at issue was *Cadle's* property and that Cadle was collecting on its own behalf and not on behalf of another entity." [31] Schlichtmann further contends that these representations were false and that their assertion by TCC constituted a fraud on the court. I find as follows.

a. Though the opposition does not contain three of the four statements that Schlichtmann alleges,[32] it nonetheless states directly: "The Cadle Company

---

30. Motion for Sanctions, p. 24 (emphasis in original).

31. Motion for Sanctions, pp. 24–25 (emphasis added).

32. Schlichtmann's statement implies that TCC said in the opposition that it "holds a security interest in the firm's accounts receivable." The opposition actually states:

> As the First Circuit made clear, "Schlichtmann concedes that Cadle holds a security interest in the firm's account receivable which encompassed any Groton fee received by the firm." 267 F.3d at 18.

Schlichtmann's statement implies that TCC said in the opposition that "the attorney fee that was being pursued by The Cadle Company *was the property of the Cadle Company*." The opposition actually states:

> Rather, Attorney Schlichtmann denies the reality that the First Circuit has ruled that the attorney fee that was being pursued by

the Cadle Company was the property of the Cadle Company, because of its security interest.

Schlichtmann's statement implies that TCC said in the opposition that Schlichtmann had "converted *The Cadle Company's asset.*" The opposition actually states:

> While the District Court ruled that there was no security interest, the First Circuit ruled that there was such an interest, and that, by refusing to return the fee to the secured party, Attorney Schlichtmann had converted The Cadle Company's asset.

In each instance, TCC was indicating what the First Circuit had stated, not making a direct statement of position of its own. By lifting phrases out of context, Schlichtmann materially misrepresents the substance of what was said.

was pursuing its security interest"; and "the fee was ... collateral in which The Cadle Company had a security interest." As Schlichtmann contends, TCC was indeed representing, by these statements in the opposition, that the security interest at issue was TCC's property.

b. This representation was true: TCC was the holder of the notes and attendant security interest and, as such, had a property interest in them and the right to enforce them in its own name. TCC never transferred any portion of its interest in the notes and security interest to AJV. AJV had only a right, under the Joint Venture and Servicing Agreements, against TCC to turnover of proceeds from liquidation of the notes. Although the parties have loosely referred to this right as an "interest," it is not a property interest because it does not follow or attach to the notes. Rather, it is contractual in nature and enforceable only against TCC. Therefore, the notes and security interest were TCC's and TCC's alone. But even if AJV's "interest" in the notes were deemed a property interest, the interest would not be such a one as negated the interest held by TCC. It would remain true that the security interest was TCC's.

c. TCC did not also state in the opposition, either expressly or by implication, "that Cadle was collecting on its own behalf and not on behalf of another entity." The opposition is simply silent on that issue. The issue of whether another entity had any interest in or connection to the SCC & H notes was nonexistent at the time; it was not an issue that Machanic and TCC believed themselves to be addressing in the opposition.

d. Nor has Schlichtmann demonstrated that either Machanic or TCC omitted mention of AJV's "interest" in the SCC & H notes deliberately, much less with intent to deceive. Machanic himself had

no knowledge of AJV's interest at the time. Schlichtmann suggests that TCC may nonetheless have deliberately kept Machanic in the dark on the issue, so that he would unwittingly conceal AJV's interest. There is no evidence to support this. Schlichtmann has adduced no evidence as to what TCC had by then communicated to Machanic by way of instruction or background information.

80. The court held a hearing on the 2–11–02 motion on July 16, 2002. On July 24, 2002, the court (Kenner, J.) denied the motion. With respect to the requests for injunctive relief, which boiled down to a request to enjoin TCC's continued prosecution of the District Court action, the court denied the motion with prejudice. The court expressly held that it was bound by the decision of the Court of Appeals on the extent of TCC's security interest, and therefore that Schlichtmann's discharge did not enjoin TCC from prosecuting its conversion count for redress of Schlichtmann's postpetition actions in derogation of TCC's security interest. With respect to Schlichtmann's demands for compensatory and punitive sanctions against Cadle for past violations of the discharge, and his request to reopen the bankruptcy case to adjudicate that demand, the court denied the motion without prejudice to its renewal upon conclusion of the District Court action, including any further appeals.

81. At the July 16, 2002 hearing in the Bankruptcy Court on the above motion, Schlichtmann told the court that a court in Tarrant County, Texas, had turned over to a sheriff all of TCC's claims against Schlichtmann, for sale by the sheriff at public auction, the proceeds to be applied in satisfaction of an outstanding Texas judgment against TCC. Judge Kenner asked Schlichtmann, "Are you saying Cadle Company no longer holds the debt?"

Schlichtmann responded that there was a cloud on TCC's title, the cloud being a Texas "turnover order," the substance and import of which were unclear. Judge Kenner then addressed counsel for TCC, Mr. Machanic, in the following colloquy:

> THE COURT: Does Cadle hold the debt today?
>
> MR. MACHANIC: No. Actual—well, we have a security interest in a fee. The case has been remanded to the District Court for a determination as to how much of that fee remained in Attorney Schlichtmann's hands as of the date we made our first demand on him for payment.
>
> THE COURT: Have—Let me ask the question a different way then. Have you sold your interest to anyone as of July 16, 2002?
>
> MR. MACHANIC: Not to my knowledge.
>
> THE COURT: Have you inquired or your client?
>
> MR. MACHANIC: No, I haven't. This is the first time I've heard personally of this.
>
> THE COURT: Let's take a recess, and you can discuss it with your client, but what I understand Mr. Schlichtmann to be saying is that you no longer have standing.... We'll take a five-minute recess and you can discuss the issue of whether your client still holds the debt.

At this point, the court took a short recess. The colloquy then continued:

> THE COURT: Were you able to discuss this with your client?
>
> MR. MACHANIC: Yes, I was, your Honor.
>
> THE COURT: Okay. Let me ask the question. The question is: does Cadle Company still hold the debt?

> MR. MACHANIC: I don't know how to answer that question directly. They are under order to turn over the debt that's deemed to be the property of the sheriff under a temporary restraining order. July 10 a hearing to set aside the temporary restraining order began, but it hasn't yet been finished.
>
> THE COURT: Oh. Before whom?
>
> MR. MACHANIC: Before the judge in Tarrant County, Texas.
>
> THE COURT: I'm a little confused. I understood the debtor to say that you sold the debt.
>
> MR. MACHANIC: No, we did not sell the debt.
>
> THE COURT: You did not sell it.
>
> MR. MACHANIC: Correct.

Whereupon the hearing went on to other subjects.

82. On August 13, 2002, Schlichtmann filed another motion in the Bankruptcy Court, this time demanding an order to show cause why TCC should not be held in contempt and subject to sanctions for giving information that was not true in response to the foregoing inquiry as to the status of the debt and the standing of TCC. In the motion, Schlichtmann alleged that Daniel Cadle, in a letter he had sent to a Mr. David Evans in relation to a Texas sheriff's sale (about which more below), had stated: TCC does not own the debt in issue in this case; rather, TCC is the servicing agent for the account, and the account is owned by Atlanta Joint Venture.

83. In response to this motion, the Bankruptcy Court did not issue an order to show cause or otherwise require TCC or Machanic to respond. Rather, on September 30, 2002, Judge Kenner denied the motion and, in a memorandum of decision, set forth two reasons for the denial. First,

the court explained, the motion was predicated on a misunderstanding of the subject of the court's inquiry: the focus had been on Schlichtmann's allegation that the action in Texas had somehow resulted in a transfer of TCC's rights against Schlichtmann. "My inquiry did not concern Cadle's underlying interest in the rights against Schlichtmann; I was simply asking whether that interest, whatever it was, had somehow been lost or sold by virtue of the Texas action." Second,

> even if my question were construed as inquiring into whether Cadle's underlying interest was sufficient to give it standing to enforce the cause of action against the Debtor, Cadle's answer would not be false. Cadle's counsel told me that it owned, and had not sold, the rights on which its cause of action against the Debtor was predicated. If Cadle owned those rights as a servicer for another entity, Cadle still (1) had title to the rights and (2) standing to enforce them against the Debtor. By definition, a "servicer" is one who holds title for another and legal authority to administer the asset in question for the other.

Schlichtmann took no appeal from the order of denial.

84. As her memorandum of decision indicates, Judge Kenner herself understood her questions to Machanic as relating to any changes in standing or ownership that may have resulted from the Texas sheriff's sale, not to TCC's underlying interest in the rights against Schlichtmann. From the context in which her questions were posed, an attorney in Machanic's position would have understood her questions accordingly, as pertaining solely to whether any change had been effected by the action in Texas; no question or issue had been raised at that hearing as to TCC's underlying interest

in the rights against Schlichtmann—that issue was on no one's radar at the time. On the basis of Machanic's testimony in this matter and of pleadings he filed in the District Court action in the months after these events, I find that he understood Judge Kenner's questions as she had intended—as asking whether any change had been effected by the action in Texas—that he was correct· in so understanding them, and that he answered the questions truthfully and without intent to deceive or conceal.

### j. 2002: The Texas Sheriff's Sale

85. By July of 2002, Schlichtmann had made contact and common cause with other account debtors of TCC and their attorneys who were litigating against TCC in other proceedings elsewhere in the nation. One of these was a civil action in a Texas state court, the District Court of Tarrant County, known as *The Cadle Company v. Bankston & Lobingier et al.* ("the *Lobingier* action"). It is important here because, in the summer of 2002, David Lobingier and the State of Texas filed motions therein for turnover of certain assets of TCC to a sheriff for sale and application of the proceeds thereof in partial satisfaction of judgments held by the State of Texas and by David Lobingier against TCC. On August 23, 2002, the court allowed that motion. The turnover order stated that

> the following property is hereby deemed turned over to the Sheriff or Constable of Tarrant County, Texas for execution as ordered herein: ...
>
> 2. *Schlichtmann Claims:*
>
> a. All rights, claims, and/or causes of action belonging to The Cadle Company, whether know or unknown, whether contingent or fixed, whether accrued or unaccrued, whether arising in contract or in tort, whether for actual or

punitive damages against any individual or entity, which has been or could have been asserted or could have been described in the lawsuit including any appeal asserted, arising in any manner or in any time against Jan R. Schlichtmann, including but not limited to those asserted in a Civil Action No. 95–11409–GOT; styled *The Cadle Company v. Schlichtmann, Conway, Crowley & Hugo [et al.],* in the United States District Court, District of Massachusetts.

IT IS FURTHER ORDERED that the Sheriff or Constable of Tarrant County, Texas shall be deemed to be in possession of the claims and property to be delivered to him as of the date of the signing of this order and shall levy on such property as under a writ of execution and after giving notice of sale, sell the property at public auction to the highest bidder for cash, applying the proceeds of the sale to the payment of expenses of sale and court costs, with the balance paid over to David Lobingier and the State of Texas for credit on the judgments described herein.

On September 20, 2002, the court entered an amended turnover order to the same effect. On October 15, 2002 and pursuant to these orders, the Tarrant County sheriff did sell the "Schlichtmann Claims" at auction for $52,000 to Jan Schlichtmann.

**k. *2002–2003: Proceedings Upon Remand***

86. TCC's conversion action was remanded from the Court of Appeals to the District Court in January 2002. TCC moved for a status conference in April, but the action remained dormant until August 2002. On August 7, 2002, Schlichtmann filed a flurry of motions in the District Court, including a motion for summary judgment on the conversion count or, in the alternative, an evidentiary hearing or jury trial.

87. The next day, however, Schlichtmann received, by facsimile transmission from David Evans, a Texas attorney who represented the David Lobingier in the Lobingier action, a letter that Daniel Cadle had faxed to Evans on August 7, 2002, marked prominently, "FOR SETTLEMENT PURPOSES ONLY." Daniel's letter concerned the then-pending turnover motions in the Lobingier action and the two assets as to which turnover was being sought, including TCC's rights against Schlichtmann. In the letter, Daniel stated, in relevant part:

> It is also important to note that the Cadle Company is the servicing agent for both of the loans, and it has a monetary interest in the collection proceeds after attorney fees, costs, etc. . . . The proceeds of the Schlichtmann case is owned by Atlanta Joint Venture and has been in the collection process since 1992.

It was on August 8, 2002, upon reading this letter, that Schlichtmann learned for the first time that TCC was a servicing agent for the SCC & H notes, including the conversion action against him, and that an entity other than TCC was entitled to the proceeds of the notes and the conversion action.

88. With this new information, Schlichtmann filed three motions. The first has already been discussed: his motion of August 13, 2002 in the Bankruptcy Court for an order to show cause why TCC should not be held in contempt for giving false information in response to the bankruptcy judge's inquiry as to the status of the debt and the standing of TCC. The second, also filed August 13, 2002 but in the District Court, was an amendment to

his Motion For Summary Judgment Pursuant to Remand Order; by this amendment, Schlichtmann sought dismissal of the conversion count on the basis that TCC did not own the debt at issue.[33] The third motion, filed in the District Court on August 29, 2002, was entitled Motion for Evidentiary Hearing Concerning Plaintiff's Fraud Upon the Court.[34] By this last motion, Schlichtmann demanded that (1) the court order an evidentiary hearing on the alleged fraud on the court, (2) that the court order Daniel Cadle to appear personally to answer questions concerning who the true owner of the collateral is, and (3) "for such relief as may be appropriate, including a default and sanctions against Cadle [TCC]." The basis of this motion was TCC's alleged engagement in "a pattern and practice of fraud and deceit upon this Court, the Bankruptcy Court, and the First Circuit Court of Appeals" concerning concealment of Atlanta Joint Venture's interest in TCC's conversion claim against him. The "fraud and deceit upon ... the Bankruptcy Court" for which this motion sought relief was the same conduct that formed the basis of Schlichtmann's motion of August 13, 2002 in the Bankruptcy Court for an order to show cause.

89. On September 9, 2002, the District Court held a status conference at which Schlichtmann's counsel reported that TCC's rights against Schlichtmann in the District Court action would soon be auctioned by a sheriff in Texas, and that "the litigation" might be bought by "Mr. Cadle ... or Mr. Schlichtmann ... or some third party." Schlichtmann's counsel also reported that a new issue had arisen since remand, the issue over whether TCC owned or held the notes that formed the basis of its conversion claim, and that Schlichtmann had moved for an evidentiary hearing regarding fraud on the court. The Court indicated that it would do nothing on the pending motions until after the sheriff's sale in Texas.

90. At the September 9 status conference, the Court asked the parties whether, in view of the new issues concerning ownership of the rights against Schlichtmann, AJV was a necessary party. TCC's attorney Scott Machanic responded that AJV was not a necessary party and, in explanation, said: "as I understand it, there is no evidence in existence of anything in writing between The Cadle Company and Atlanta Joint Venture." Citing the existence of the several writings then in existence between TCC and AJV—to wit, AJV's Joint Venture Agreement, TCC's Loan-Servicing Agreement with AJV, and various writings concerning the 1994, 1996, and 1997 Mahoning National Bank loans—Schlichtmann now contends that this was a fraudulent misrepresentation by Machanic and TCC to the court. The issue is of relevance in this proceeding only as it bears on the credibility of Machanic and TCC.

I find that the statement was not knowingly false and not an attempt by Machanic or TCC to deceive the District Court. When the statement in question is read in context, it is clear that Machanic was talking not about writings in general, but about writings that might have effected a transfer of TCC's rights against Schlichtmann to AJV. Schlichtmann's counsel had just said: "The Cadle Company did in fact

33. In this motion, Schlichtmann, by his Attorney Garve Ivey, represented that Daniel had said in his letter to Evans: "the account is 'owned by Atlanta Joint Venture.'" This was a material misrepresentation of the contents of the letter. The letter actually said: "The *proceeds* of the Schlichtmann case is owned by Atlanta Joint Venture." (Emphasis added.)

34. Debtor's Exhibit 57.

buy this debt from the FDIC in 1992. There is no dispute about that. But the problem is that before the lawsuit, they [meaning TCC] *in some way transferred or signed or hypothecated to the Atlanta Joint Venture*" (emphasis added). In was in response to that statement that Machanic made the statement in question. His full statement was as follows:

> First of all, there is no evidence and can't be any evidence because, as I understand it, there is no evidence in existence of anything in writing between The Cadle Company and Atlanta Joint Venture. Atlanta Joint Venture is essentially a partner, limited partnership that was set up by the Cadle Company. The—with The Cadle Company as the general partner. So even if Atlanta Joint Venture was a real party in interest, they would be represented by Cadle Company as the general partner. But the note and security interests were bought by The Cadle Company. They were assigned to the Cadle Company by the FDIC. And there has never been any writing that has ever transferred that ownership interest in the notes and the security interests to anyone else.

The context makes clear that Machanic was talking about a writing that might have effected a transfer of TCC's rights against Schlichtmann to AJV. None of the documents that Schlichtmann cites would fit that description. There was therefore no falsehood and no misrepresentation. Moreover, Machanic testified that he was unaware at the time of the existence of the written servicing agreement and of the documents relating to the Mahoning loans; and there is no evidence to the contrary.

He also made clear that he would have deemed the Mahoning loan documents irrelevant to the point he was trying to make in the District Court, and I agree that the Mahoning documents were not relevant.[35] And the other document that Schlichtmann cites, the AJV Joint Venture Agreement, is not an agreement between TCC and AJV; TCC is a party to that agreement but AJV, though formed by the agreement, is not a party to it. For all of these reasons, I find no falsehood and no intent deceive.

91. On October 15, 2002, Schlichtmann purchased TCC's rights against him at the Texas sheriff's sale.

92. In response, AJV moved in the District Court to substitute AJV for TCC as the party plaintiff or to join as a party plaintiff or to permit AJV to intervene as a party plaintiff (the "Motion to Intervene"). In support of this motion, AJV submitted an affidavit of Daniel Cadle in which Daniel stated: "While The Cadle Company does hold legal title to the notes and security interests giving rise to our claim against the collateral which Defendant Schlichtmann held, the Cadle Company was permitted to hold title so as to be the servicing agent and/or general partner on behalf of Atlanta Joint Venture"; and "The interests of the Cadle Company in this litigation are limited. One role is as servicing agent on behalf of its principal, Atlanta Joint Venture." Schlichtmann opposed the motion.

93. On November 14, 2002, the District Court held a hearing on the pending motions at which it addressed two matters: whether, where Schlichtmann had purchased TCC's rights in the action, AJV should be permitted to intervene or be

---

**35.** The Mahoning loans had been fully repaid by 2002, so TCC's collateral assignments of its interests in the SCC & H notes were moot. They had not and could not result in alienation of TCC's rights in the notes. And TCC had retained the right to enforce the notes even while the loans were outstanding.

substituted for TCC as party plaintiff, such that the action would simply continue with a new plaintiff substituted for the old; and whether Schlichtmann's purchase of TCC's rights rendered moot his motion concerning fraud on the court.

a. With respect to the motion to intervene, after hearing argument from Mr. Machanic for AJV, the court indicated that it would deny the motion to intervene. As grounds for this ruling, the court stated only (1) that the case was seven years old ("you have got a fat chance of my allowing that in a case that is, what, seven years old") and (2) that AJV could commence a new action in its own name ("well, or you bring another lawsuit and see what happens"). The court did not mention estoppel, misrepresentation, or fraud as cause to deny intervention. Nor did the court address any issue concerning whether TCC had properly brought the District Court action in its own name.

b. With respect to Schlichtmann's motion regarding fraud on the court, there occurred the following colloquy between the court and Schlichtmann's attorney, Garve Ivey:

THE COURT: Mr. Schlichtmann wants to allege some fraud on the court because the real party in interest was not properly named. I may not have that right.

MR. IVEY: We have made that allegation, yes.

THE COURT: So I still say the case ought to be dismissed as moot because where is the damage to you? You have—there may be been a—when I say "you," Mr. Schlichtmann—there may have been potential damage but he preempted that by buying the thing out.

MR. IVEY: Judge, I believe as to Mr. Schlichtmann he did. My take on the fraud on the court is more that it is the damage and the injury to the court system for this oldest case on your docket—

THE COURT: Well, you know—

MR. IVEY:—more than it is to Mr. Schlichtmann.

THE COURT: If there has been that kind of fraud, somebody ought to just tell the U.S. Attorney and maybe there will be a prosecution. But I don't know that it presents a case in controversy.

The Court then indicated that it would deny Schlichtmann's claim for fraud on the court and instructed Schlichtmann to submit a form of order.

94. On November 25, 2002, the District Court entered a single order that (1) denied AJV's Motion to Intervene, (2) denied as moot Schlichtmann's Motion for Evidentiary Hearing Concerning Plaintiff's Fraud Upon the Court,[36] (3) denied as moot Schlichtmann's Amendment to Motion for Summary Judgment, and (4) dismissed the action. A separate order of dismissal entered on December 9, 2002.

95. TCC and AJV filed a notice of appeal. Schlichtmann did not. On appeal, TCC and AJV argued that, while TCC had been the holder of the SCC & H notes and therefore the proper party plaintiff (until Schlichtmann's purchase of TCC's rights in the action), TCC had brought the action as a servicing agent for, and general partner

---

**36.** As to this motion, the order actually states "ALLOWED as moot." Schlichtmann states that the District Court meant "denied as moot." Trial transcript, 7/25/05 at p. 15. The District Court having awarded no relief and conducted no evidentiary hearing on the motion, this court agrees that the District Court meant "denied as moot." The ruling has been so understood by all courts and parties concerned.

of, AJV; that TCC had only a one percent interest in the claim against Schlichtmann, and AJV held the remaining ninety-nine percent interest; that Schlichtmann purchased, at most, only TCC's one percent interest in the claim against Schlichtmann; that Schlichtmann could not and did not purchase TCC's obligations as a servicing agent to AJV; that, after Schlichtmann's purchase of TCC's rights against him, only AJV could properly represent AJV's interests in the action; and that AJV had timely moved to intervene.

96. In a decision issued on July 31, 2003, the Court of Appeals affirmed the decision of the District Court in all respects. See *Cadle Company v. Schlichtmann, Conway, Crowley & Hugo*, 338 F.3d 19 (1st Cir.2003). It ruled that the District Court had properly denied AJV's Motion to Intervene as untimely and had properly denied TCC permission to continue in the action as representative of the interests of AJV. The court summarized:

> This is not to say that the claim against the defendants has been extinguished; if some other party has a claim then that claim is unaffected. However, Cadle has no cognizable interest in this suit because its interests in this suit, whatever they were, were sold in the sheriff's sale. Further,

Cadle is estopped to assert that it was acting as an agent all along; thus, Cadle has no role to play in this litigation, and there are no other plaintiffs to continue the action.

*Id.* at 22. It is important to note also what the Court of Appeals did not find and did not rule.

a. It did not rule that the District Court action should have been brought by AJV instead of, or in addition to, TCC.[37]

b. It did not rule that TCC or AJV should have disclosed AJV's connection to the debt in the District Court complaint or in discovery in that action. At most, it ruled that, *if* Atlanta intended to assert an interest in the claims against Schlichtmann at all, it should have done so *at the September 9, 2002 status conference* in the District Court action, because at that time the Texas sheriff's sale had been scheduled, Schlichtmann had raised an issue as to TCC's continued standing in the matter, and the District Court had to make a decision as to whether the District Court action should be continued pending the sheriff's sale.[38]

---

37. After noting that "Cadle argues that its positions were consistent because, according to the Uniform Commercial Code, its status as a holder entitled it to enforce the debts in its own name and hold itself out as owner of the debts," the Court stated, "[w]hether what Cadle told the District Court is technically true or not, according to the Uniform Commercial Code (or any other law), *is beside the point.*" *Id.* at 22. The court simply did not address the issue of whether TCC's status as a holder entitled it to enforce the debts in its own name and hold itself out as owner of the debts.

38. The Court reasoned: "Atlanta should have known that Cadle's claim was being sold in

Texas. Atlanta also should have anticipated the problems this sale would create, given that Atlanta had allowed Cadle to hold itself out for seven years as owner of the debts. Nonetheless, it allowed the District Court to halt proceedings for weeks to await the results of the sale, which might not have been necessary had Atlanta disclosed that its major interest in the debts was not being sold in Texas. It was only after the sale that Atlanta decided to make its presence felt. Under these circumstances, we cannot say that the District Court abused its discretion in deciding that Atlanta's motion was untimely." *Id.* at 21.

c. It did not find or rule that AJV had a property interest in the debt, much less determine the nature of that interest. Precisely because TCC was estopped from asserting that AJV held an interest in the debt and that TCC had merely been servicing that interest, it became unnecessary for the Court of Appeals to determine the nature of AJV's interest.

d. It did not find or rule that AJV had acted with fraudulent intent in failing to disclose or assert AJV's connection to the debt at the September 9, 2002 status conference. The court stated that "Atlanta *should have known* that Cadle's claim was being sold in Texas" and that "Atlanta *should have anticipated* the problems this sale would create," but it made no finding or ruling that Atlanta's failings were the result of intent to deceive or manipulate.

e. It did not find or rule that TCC had acted with fraudulent intent in failing to disclose or assert AJV's connection to the debt at the September 9, 2002 status conference.[39]

97. TCC and AJV promptly moved for rehearing, but that motion was denied on August 15, 2003, whereupon the appeal and the underlying District Court action came to a strange close.

### l. *2003–2005: Other Fronts*

98. So closed only one battle. Schlichtmann almost immediately returned to the Bankruptcy Court to prosecute his claim for violation of his discharge against TCC, AJV, and Daniel Cadle. The procedural history of that matter is set forth below.

99. Schlichtmann's efforts against the Respondents during this period were not limited to redress for alleged violation of his discharge. In additional efforts:

a. As set forth more fully below, Schlichtmann sought to resurrect in the Bankruptcy Court claims against the same parties for fraud on the court.

b. Commencing in April 2003, and continuing for approximately two years, he created, published, and maintained an anti-TCC web site called truthaboutcadle.com. The web site was designed and intended by Schlichtmann as a source of information about some of his efforts against TCC. It features newspaper articles about those efforts, demand letters drafted by Schlichtmann against TCC on behalf of individuals seeking relief against TCC, letters from Massachusetts state officials to and about TCC, biographical information about Schlichtmann as a plaintiff's attorney, and contact information. The latter includes the following:

 i. "To find out more or if you believe you have been victimized by The Cadle Company, contact us directly," followed by a telephone number;

 ii. "If you want to learn more about this growing effort, contact us directly by email or by phone."

 iii. "This site was created and sponsored by Jan R. Schlichtmann, Attorney at Law, P.C., as a service advertising this effort. Attorney Schlichtmann has been fighting the Cadle Company for

---

**39.** The opinion pointedly stops short of any finding regarding specific intent: *"For whatever reason,* Cadle maintained its position that 'it own[ed] the note,' was 'the real party in interest here,' and had sole legal entitlement to any proceeds from this suit." *Id.* at 22 (emphasis added).

the past 10 years.... Attorney Schlichtmann now represents several other victims of Cadle's unlawful business practices."

Schlichtmann denies that the site was intended as professional advertising; while I do not doubt that it was not *solely* an effort on his part to drum up business, it clearly was in part an effort by Schlichtmann to connect with potential plaintiffs whom he might represent in further efforts against TCC, and the Respondents did justifiably so understand it. The site featured numerous allegations that TCC has been operating an illegal debt collection business in Massachusetts and employs fraudulent practices and intimidation.

c. Throughout this period, he made a number of statements about TCC, all tending to discredit TCC, that appeared in diverse publications, including the truthaboutcadle.com web site, the Boston Herald, and the boston.com web site.

d. He began to represent account debtors of TCC in litigation between them.

e. He sought out account debtors of TCC who were in ongoing litigation with TCC and offered advice and assistance in fighting TCC.

f. He opposed efforts by TCC to register as a debt collection agency in Massachusetts.

g. He instigated investigations of TCC with the Massachusetts Secretary of State and, by referral from the Sec-retary of State, with the Massachusetts Division of Banking and the Massachusetts Attorney General.

h. As plaintiffs' counsel, he commenced a class action (though it is not clear whether a class was ever certified in the action) against TCC in Massachusetts Superior Court for violation of Massachusetts debt collection laws.

100. The cumulative effects of all these actions on the Respondents included a gross increase in attorney's fees and other costs of doing business, significant damage to their reputation, and a massive diversion of time and effort. Daniel Cadle, TCC, and AJV were aware of these activities by Schlichtmann and reasonably viewed them as threats to the business of TCC and its affiliates. The Respondents further reasonably concluded that they were intended by Schlichtmann to harass the Respondents, to harm and interfere with their business, to shut them down if possible, and to pressure them into agreeing to pay a sizable settlement to Schlichtmann to make him go away.[40]

101. TCC responded to some of Schlichtmann's above effort by suing him for defamation and related claims,[41] first in a federal district court in Ohio and then in Massachusetts Superior Court. The suit in Ohio was filed on October 22, 2003 and dismissed for lack of personal jurisdiction. On February 7, 2005, the dismissal order was affirmed on appeal, except that, as to certain statements that were alleged to have been provided by Schlichtmann to an Ohio television statement, the dismissal was affirmed on other grounds, specifically

---

**40.** My finding here concerns what the Respondents believed and whether their belief was reasonable in the circumstances. I make no finding as to Schlichtmann's purposes in undertaking these actions.

**41.** The Ohio action included a claim for violation of the Ohio Deceptive Trade Practices Act. The Massachusetts action included counts for tortious interference with contractual and advantageous business relations, violation of G.L. c. 93A, and declaratory and permanent injunctive relief.

failure to state a claim on which relief could be granted. TCC then retained Massachusetts counsel and filed another complaint in the Superior Court of the Commonwealth of Massachusetts; as of the close of the trial in the present matter, that action remained pending. The Massachusetts complaint appears to have been competently researched and pleaded and neither frivolous nor plainly unfounded; and it does not reiterate, as a basis for defamation, the statements that were deemed in the Ohio action not to state a basis on which relief for defamation could be granted. I need make no findings or rulings as to the merits of that action; it is sufficient to note that, whatever its merits, the complaint appears to be an appropriate, proportionate, and good faith response to acts by Schlichtmann that the Respondents believe to be defamatory.

102. By a letter dated August 29, 2003 but transmitted to the Court by facsimile transmission only on December 19, 2003, Daniel Cadle further responded to Schlichtmann's efforts by asking the Bankruptcy Court to reopen Schlichtmann's bankruptcy case to investigate allegations of bankruptcy fraud by Schlichtmann. At the time, Schlichtmann himself had moved to reopen the bankruptcy case for the limited purpose of adjudicating claims against the Respondents for violation of his discharge, and that motion remained pending. The letter was addressed to Bankruptcy Judge Carol Kenner, to whom Schlichtmann's bankruptcy case was then still assigned, and also to Chapter 7 Trustee Ellen Carpenter and United States Trustee Christopher Marshall. The letter asked the Court to reopen Schlichtmann's bankruptcy case "to pursue fraud against" Schlichtmann. The letter went on to list reasons Daniel believed Schlichtmann should be investigated for having failed to list assets and liabilities and having transferred assets to keep them out of the bankruptcy estate. Noting that Daniel's request was made by letter, not motion, and carried no certification or other indication that it was served on Schlichtmann, the Court denied the motion, stating, "[t]he Court does not act on letters but only on appropriate pleadings . . . and only when such pleadings have been served on parties in interest." The request was not renewed.

103. Daniel Cadle further responded to Schlichtmann's efforts by making threats of litigation against Schlichtmann, his associate Scott Dullea, and his expert witness in the present matter, Lynda Borucki. On October 23, 2003, while Schlichtmann was deposing Daniel, Daniel said to Schlichtmann, "I'm just trying to advise you in advance . . . there is certain cost to your litigation." During a break in the same deposition, he said to Scott Dullea, the paralegal assisting Schlichtmann, that Dullea could "end up paying" Schlichtmann's legal bills and that "Jan can stop this."

104. On October 24, 2003, in a telephone conference that Daniel Cadle had arranged with Schlichtmann, ostensibly to discuss settlement, Daniel told Schlichtmann that if he did not stop his actions, retract his complaints, and tell the authorities that he was wrong, Daniel was going to hire lawyers to work full time suing Schlichtmann and people associated with him.

105. On April 12, 2005, Daniel Cadle faxed a letter to Lynda Borucki. Borucki had been retained by Schlichtmann as an expert witness in the present matter to opine on the subject of whether TCC was in the business of collecting others' debts. The letter informed Borucki that Schlichtmann may be using her expert testimony in ways she did not intend, including on his web site, and twisting it to say things she did not mean. In the Letter, Daniel asked

whether she has been shown TCC's evidence of its side of the issue, invited her to contact him and TCC to obtain that evidence, and asked her to review her research, affidavit, and findings and also the use to which these are being put by Schlichtmann. He added: "As you know, we have already sued Schlichtmann for slander. . . . We do not want Schlichtmann to draw you into that lawsuit." By virtue of this latter language, the letter was threatening and intimidating on its face, and it was perceived as such by Borucki. On the basis of this letter and at Schlichtmann's request, the Court enjoined Daniel Cadle from having any direct contact with Schlichtmann's witnesses pending a final order on the present motion.

106. Since the close of the District Court action on August 15, 2003, neither TCC nor AJV has in any overt manner attempted to enforce the discharged claims or even to recover on the dismissed claim for conversion. Schlichtmann maintains that TCC's prosecution of the defamation action against him, Daniel's request to reopen his case, and Daniel's threats against him, Scott Dullea, and Lynda Borucki are further veiled attempts to enforce the discharged debt.[42] The evidence does not support this allegation. The actions of TCC and Daniel Cadle against Schlichtmann since 2003 have been responses to Schlichtmann's multifarious undertakings against the Respondents since 2002. They need no separate *raison d'être*; by his

actions since 2002, Schlichtmann has given the Respondents more than adequate motivation for the actions he now complains of, a new and superseding animus for their actions against him.[43] Schlichtmann contends that TCC's defamation suits, Daniel's request to reopen, and his various threats have been wrongful in many and varied ways. For example, he makes allegations that many were based on lies and misrepresentations, that all were intended to interfere with proper adjudication of his claims for violation of his discharge, and that the allegations in the defamation action and letter to reopen lacked merit. I need make no findings and rulings on the truth or merits of these allegations. Whether wrongful or not, they were *not* attempts to collect the discharged debt.

## m. *Findings Regarding Allegations of Fraud*

107. Schlichtmann alleges that the Respondents fraudulently concealed from the District Court, the Court of Appeals, and this Court that Daniel Cadle set up and used TCC as the undisclosed collection agent for AJV to collect from Schlichtmann on the discharged debts. I make the following findings on the issue:

a. In filing and prosecuting the District Court action, neither TCC nor AJV disclosed, until August 2002, that TCC had purchased the SCC & H notes with funds advanced by AJV and was holding the notes for the

---

**42.** These allegations are in Schlichtmann's amendment to his Motion for Sanctions. His post-trial request for findings of fact does not ask the Court to find that these actions were attempts to collect the discharged debt. Rather, he asks for a finding that they were attempts to threaten, intimidate, injure, and economically harm him and to prevent him from holding the Respondents accountable for their violation of his discharge and to prevent and interfere with the fair administration of justice in this matter. Proposed Findings 488 and 534–36. It is not clear whether Schlichtmann now withdraws his former allegations that these actions were violations of his discharge. For lack of a clear withdrawal, I treat the earlier allegations as not withdrawn.

**43.** It is worth noting that the superseded animus was not collection of the discharged debt but recovery of the Groton fee and prosecution of the claim for conversion thereof.

benefit of AJV, that TCC was AJV's servicing agent for the notes, and that AJV was obligated under the AJV Joint Venture Agreement to turnover to AJV the proceeds from TCC's enforcement and liquidation of the notes.

b. TCC and its attorneys filed the District Court action in the name of TCC, and without disclosure of AJV's "interest" in the notes, because they believed (i) that TCC, as the holder of the notes, was well within its rights in suing to enforce the notes and the derivative conversion claim in its own name, (ii) that they were under no obligation to disclose the interest of AJV, and (iii) that AJV's right to TCC's proceeds from the SCC & H notes was irrelevant to the various claims being asserted in that action. TCC and its attorneys, Messrs. Doonan and Machanic, held these beliefs honestly, justifiably, and in good faith.

c. In filing and prosecuting the District Court action, including appeals therein, in the name of TCC without disclosing the interest of AJV in the claims being prosecuted, TCC and its attorneys acted *without* intent to deceive, defraud, or manipulate the courts or the judicial process and without intent to gain unfair advantage, or any advantage at all, against Schlichtmann and the other defendants in the District Court action.

d. TCC did not attempt to hide from the public that it owned the SCC & H notes for the benefit of AJV. This fact was made a matter of public record in UCC filings made in 1996 and 1997 in conjunction with the Mahoning loans of those years. I do not suggest that Schlichtmann might easily have come across this information, only that the information was not being guarded as a secret. Nor did TCC generally attempt to keep secret that it serviced debts for affiliates.

e. Schlichtmann has failed to show that TCC's nondisclosure of AJV's interest did or might have secured for TCC or AJV any tactical advantage in the prosecution of the conversion count against him or in the enforcement of the SCC & H notes.

d. TCC's filing and prosecution of the District Court action in the name of TCC without disclosing the interest of AJV did *not* somehow hide, mask, or constitute any attempt by TCC, AJV, or Daniel Cadle to enforce Schlichtmann's discharged *in personam* liability on the SCC & H notes. At worst, it may have resulted in the Respondents' attempting to enforce a debt that was not subject to discharge, specifically, the conversion claim—in the name of the wrong plaintiff, or in the name of the correct plaintiff but without necessary disclosures.[44] These alleged mistakes in the prosecution of the conversion claim, if they were mistakes at all, are not such as would change the character of the claim being prosecuted into one that was subject to the discharge. Even if AJV was the proper plaintiff, and even if AJV's interest should have been disclosed, the conversion claim that TCC was prosecuting remained outside the scope of Schlichtmann's discharge. There is no alchemy of

---

44. I make no ruling as to whether TCC was the correct plaintiff, or whether the interest of AJV should have been disclosed.

the sort on which Schlichtmann here relies. Either way, TCC was attempting to enforce not a discharged *in personam* liability but a post-bankruptcy claim for conversion that was not subject to discharge.

### n. *2003–2005: Resumption of Proceedings in the Bankruptcy Court*

108. On August 22, 2003, Schlichtmann filed a motion in the Bankruptcy Court by which he (1) renewed his earlier motion for an order to show cause why TCC should not be held in contempt, and compensatory and punitive damages imposed, for TCC's violation of his discharge order; (2) moved for leave to amend his original motion by adding additional respondents, specifically Daniel C. Cadle and AJV, and (3) moved to reopen his bankruptcy case for the limited purpose of adjudicating the above requests. Appearing by attorney Scott Machanic, TCC opposed the motion. The court entered the following order on the motion:

> The Debtor may file a single new motion against [TCC], Daniel C. Cadle, and [AJV] for sanctions for violation of his discharge (and *only* for violation of his discharge). He may not renew his earlier motion against Cadle Company (but may request the same relief *in* the new motion) because the earlier motion sought relief against only [TCC] and could not serve as the operative motion without

significant and confusing amendment. The new motion should identify the specific acts that each respondent is alleged to have committed in violation of the discharge.[45]

The court set a deadline of January 5, 2004 for filing of the new motion and stated that it would take no action on the motion to reopen until after that date.

109. On January 5, 2004, Schlichtmann filed the "single new motion" permitted by the Court's earlier order. Entitled Debtor's Motion for Sanctions for Violation of the Court's 1–28–92 Discharge Order (the "Motion for Sanctions"), it is the motion presently under consideration. It demands compensatory and punitive damages against TCC, Daniel Cadle, and AJV for violation of his discharge. In the Motion for Sanctions, Schlichtmann also alleges that the Respondents committed what he has referred to throughout these proceedings as "fraud on the court"—specifically, that the Respondents, in proceedings in the District Court, the Court of Appeals, and the Bankruptcy Court, fraudulently concealed that Daniel Cadle set up and used TCC as the undisclosed and unlawful collection agent for AJV to collect on the discharged debt from Schlichtmann; and he demands, on account of such fraud on the court, certain "equitable relief" in aid of his principal claim, the demand for sanctions for violation of his discharge. The equitable relief he seeks is an order

---

**45.** Bankruptcy Court order of November 5, 2003 (emphasis in original). The Respondents contend that, by this order, Judge Kenner denied *with prejudice* all relief being requested and permitted Schlichtmann to file a new motion setting forth only new grounds for relief not previously asserted. The Respondents are clearly wrong, not only because the court made no findings or rulings whatsoever on the merits but also because, in prohibiting renewal of the old motion, the court expressly permitted Schlichtmann to "request

the same relief in the new motion." The purpose of this strategy was plainly and expressly to avoid confusion by consolidating in one operative document the allegations against all three Respondents. The earlier motion that Schlichtmann was seeking to renew sought relief only against TCC and had been filed in 2002. It did not include his claims against AJV and Daniel Cadle and did not include new claims that had arisen after the original was filed.

a. estopping Respondents from attempting to "excuse their fraud" by the untimely assertion that contrary to their previous misrepresentations,

 i. Cadle had not owned the debts in full;

 ii. Cadle was not "acting to protect its own interests, not someone else's;"

 iii. Cadle was holding the debts merely as an agent for AJV and that according to the Uniform Commercial Code, its status as a holder entitled it to enforce the debt is its own name and hold itself out as owner of the debts;

b. determining that the District Court actions was purely a violation of the discharge because (i) Cadle did not have a security interest in the whole fee at issue and (ii) Respondents efforts to secure the benefits of a security interest were illegitimate;

c. striking TCC's [unspecified] pleadings in this Court as fraudulent and entering a default judgment on Schlichtmann's contempt motion against Respondents for Respondents having made fraudulent pleadings with knowledge of the pleadings' falsity and with the intent to deceive this Court;

d. enjoining Respondents from engaging in any further conduct against Schlichtmann in violation of the discharge order.

The Motion for Sanctions also demands damages, both compensatory and punitive, for this alleged fraud on the court. The Motion for Sanctions also demands an order enjoining Respondents from engaging in any further conduct against Schlichtmann in violation of the discharge order. It further includes a jury demand as to all issues so triable.

110. As required, the Motion for Sanctions identifies the specific acts that Respondents are alleged to have committed in violation of the discharge. They are as follows:

a. malicious threats to expose to expose to governmental authorities that Schlichtmann had engaged in fraud:

 i. those made by Cecil in 1992 and 1993, through Crowley and directly to Schlichtmann;

 ii. those made by Daniel in an October 2003 incident;

b. intentional issuance of false reports to credit reporting services that Schlichtmann had borrowed substantial sums from TCC and had not paid the money back and that the account was "placed for collection";

c. "institution of a fraudulent civil action in the U.S. District Court ... that Respondents fraudulently represented was an *in rem* action to enforce an Article 9 security interest owned by [TCC] but in fact was an unlawful *in personam* action on accounts owned by AJV"; and

d. attempts to foment through fraudulent means a civil and criminal investigation and prosecution of Schlichtmann by the U.S. Trustee's Office and the Bankruptcy Court in order to coerce payment from Schlichtmann and intimidate Schlichtmann form moving in this Court to hold Respondents accountable for the unlawful actions:

 i. the 1998 communications with the chapter 7 trustee and the U.S. Trustee; and

 ii. Daniel Cadle's letter filed December 19, 2003.

The Motion for Sanctions attributes each of these actions to all three Respondents.

111. Shortly after Schlichtmann filed the Motion for Sanctions, Scott Machanic and his firm moved to withdraw as counsel for TCC, stating in the motion: "the relationship between the firm and the client has been strained and, as of October 2003, the firm and the client each understood that the firm would no longer represent [TCC], Mr. Cadle, or [AJV] in this matter." The Court allowed the motion.

112. By new counsel, the Respondents filed a "preliminary response" to the Motion for Sanctions. Around this time, Judge Carol Kenner, to whom the bankruptcy case had been assigned, retired from the bench. Schlichtmann then moved for reassignment of the case. On September 28, 2004, by Chief Judge Joan Feeney, the Court denied reassignment as unnecessary but also entered a pretrial order that (a) required the Respondents to file a full answer to the Motion for Sanctions and (b) established a schedule for the completion of discovery and other pretrial matters.

113. On October 15, 2004, the Respondents timely filed their "full answer," a five-page objection, combined with a motion to dismiss the Motion for Sanctions. In their opposition, the Respondents essentially denied that they had done anything to enforce the discharged debt; rather, they had only enforced their security interest in the Groton fee by prosecuting a conversion action against Schlichtmann for his post-bankruptcy actions in violation of their property interest in the fee. They argued that, by virtue of the 2001 opinion of the Court of Appeals, the validity of TCC's interest in the whole of the fee was *res judicata*, and therefore the District Court action could not have been a violation of the discharge order. In support of their motion to dismiss, the Respondents argued that the various actions that Schlichtmann contends were violations of his discharge had all previously been rejected by the Bankruptcy Court as grounds for relief. They further argued that Judge Kenner's order of November 5, 2005, permitting Schlichtmann to file a "single new motion" against all three Respondents, had effectively *denied* all relief that had been requested in the motion that Schlichtmann was then seeking to renew (his original motion for sanctions of 2/11/02), and permitted Schlichtmann to file a new motion on the basis only of new grounds not previously asserted. As Schlichtmann was merely proceeding on the basis of actions that had previously been raised, the Respondents argued, his Motion for Sanctions had to be denied. Schlichtmann opposed the motion to dismiss and·moved for Respondents' Objection and Motion to Dismiss be struck as inadequate and that judgment enter for him, essentially by default.

114. Upon my appointment as a bankruptcy judge, I inherited the cases previously assigned to Judge Kenner and accordingly, on February 8, 2005, held a status conference regarding the Motion for Sanctions and related pending motions. At the close thereof, the Court denied the Respondents' motion to dismiss, stating that, "while issues of *res judicata*, collateral estoppel, and law of the case may apply to some, indeed many of the elements of this case, they clearly do not apply to all. There are disputed matters that require trial." The Court also (a) denied Schlichtmann's motion for judgment, stating that he was not entitled to judgment on his sanctions motion without a trial, (b) reopened Schlichtmann's bankruptcy case for the limited purpose of adjudicating the Motion for Sanctions; and (c) denied a request by the Respondents for leave to file a fuller answer.

115. On February 23, 2005, Schlichtmann filed a motion for equitable relief, seeking an order

a. striking any reference in Respondent's pleadings before this Court to the representations regarding Cadle's "ownership" of the debts and security interest at issue including:

 i. Cadle was the "secured party";

 ii. Cadle held a security interest in the firm's accounts receivable;

 iii. The "attorney fee that was being pursued by The Cadle Company was the property of the Cadle Company"; and

 iv. Schlichtmann had "converted The Cadle Company's asset."

b. estopping Respondents from attempting to excuse or defend their making contradictory representations to the Court by the untimely assertion that, contrary to their prior representations:

Cadle "was holding the debts merely as an agent for" AJV and that "according to the Uniform Commercial Code" "or any other law," "its status as a holder entitled it to enforce the debts in its own name and hold itself out as owner of the debts." [46]

The Court denied the motion without prejudice, stating that the applicability of judicial estoppel would be determined after trial.

116. By order of March 9, 2005, the Court (i) noted that Schlichtmann had withdrawn his jury demand and (ii) denied the Respondents' jury demand, stating: "There is no right to a jury trial on a cause of action for violation of the bankruptcy discharge; such actions originate in equity—bankruptcy relief being a creature of equity—and concerns enforcement of an order of the court." Two months later, and by a single motion, the respondents (i) renewed their motion for trial by jury because the matters at issue include criminal contempt, (ii) moved for a determination that the bankruptcy court lacked subject matter jurisdiction over Schlichtmann's demands as to criminal contempt (but not those as to civil contempt), and (iii) moved for summary judgment on the basis that the Debtor could not hope to show, with the requisite clarity, that the Respondents knew that the discharge order applied to the debt they were enforcing. By order of May 18, 2007, and for reasons articulated on the record at a hearing of the same date, the Court ruled that it had subject matter jurisdiction over the demand for punitive damages, that the Respondents were estopped from seeking transfer of this proceeding back to the District Court; that the Respondents had waived their right to a jury; and the Motion for Sanctions would be tried without a jury. By a separate memorandum and order of the same date, the Court also denied the motion for summary judgment.

117. On a motion by Schlichtmann and by order of May 4, 2005, the Court permitted Schlichtmann to amend the Motion for Sanctions by adding two further acts that Respondents are alleged to have committed in violation of the discharge:

a. TCC's commencement of a defamation action against Schlichtmann in Massachusetts Superior Court on April 11, 2005; and

b. Daniel Cadle's letter of April 12, 2005 to Schlichtmann's expert witness, Lynda Borucki.

118. By agreement of the parties, the trial of the Motion for Sanctions was bifurcated, with liability issues to be tried first and damages as necessary afterwards.

---

**46.** Debtor's Motion for Equitable Relief Pursuant to the 1st Circuit's Judicial Estoppel Order, pp. 3–4.

The liability phase was tried over nine days from May 25 through September 20, 2005. The Court accepted into evidence, without limitation, much of the record of the District Court action, including the entire trial transcript. Notably, the Court also accepted into evidence a 1998 affidavit of attorney Joseph Schindler and a 1998 deposition of Cecil Cadle, taken in the District Court action. At the close of Schlichtmann's evidence, the Respondents made a motion for directed verdict, and the Court denied the motion. Also, on the sixth day of the trial, the Respondents raised the defense of issue preclusion as an affirmative defense to Schlichtmann's claim for fraud on the court; the Respondents argued that the District Court's denial of Schlichtmann's Motion for Evidentiary Hearing Concerning Plaintiff's Fraud Upon the Court precluded him from raising that issue again in the Bankruptcy Court. Over Schlichtmann's objection, the Court permitted the Respondents to submit evidence on the affirmative defense and Schlichtmann an opportunity to present his rebuttal, effectively permitting amendment of the answer.[47]

## RULINGS OF LAW

### Jurisdiction

119. For jurisdictional purposes, the Motion for Sanctions seeks four distinct kinds of relief: (i) compensatory damages for civil contempt of the Bankruptcy Court's discharge order, (ii) punitive damages for criminal contempt of the same order, (iii) damages arising from fraud on the court that is alleged to have occurred in proceedings in this court in Schlicht-mann's bankruptcy case, and (iv) damages arising from fraud on the court that is alleged to have occurred in proceedings in other courts.

■■■ a. **Contempt Power:** By virtue of 11 U.S.C. § 105(a),[48] a bankruptcy court has subject matter jurisdiction to enforce the discharge injunction by the contempt power. *Bessette v. Avco Financial Services, Inc.,* 230 F.3d 439, 445 (1st Cir.2000) (§ 105 provides a bankruptcy court with contempt power to enforce the discharge injunction). The contempt power so vested in the bankruptcy court includes the power to compensate the injured party for losses sustained, one of the powers of "civil contempt." *Id.* at 445 (recognizing that bankruptcy courts have appropriately used their contempt power to award actual damages and attorney's fees); *Eck v. Dodge Chemical Co. (In re Power Recovery Systems, Inc.),* 950 F.2d 978[798], 802 (1st Cir.1991) ("sanctions in a civil contempt proceeding are employed ... where appropriate, to compensate the harmed party for losses sustained"). The Respondents contend that the bankruptcy court's contempt power does not extend to entry of punitive damages, the province of "criminal contempt"; and there is authority for that proposition in other circuits. In this circuit, however, the Court of Appeals has recognized the contempt power of the bankruptcy court as extending to awards of punitive damages. *Bessette v. Avco Financial Services, Inc.,*

---

47. Schlichtmann was not prejudiced: the evidence on the issue was limited and had already been submitted by Schlichtmann himself as part of the District Court record; the burden of proof rested on the Respondents, who had not yet presented their case; and Schlichtmann would have an opportunity afterward to submit any rebuttal he may have. Moreover, justice clearly required consideration of the defense, lest the parties be permitted to litigate without end.

48. Section 105(a) provides: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

230 F.3d at 445 ("bankruptcy courts across the country have appropriately used their contempt power to order monetary relief, in the form of actual damages, attorney fees, *and punitive damages,* when creditors have engaged in conduct that violates § 524" (emphasis added)); *In re Latanowich,* 207 B.R. 326, 333 (Bankr.D.Mass.1997) (construing § 105(a) as authorizing punitive sanctions). I hold accordingly. A contempt proceeding to enforce the discharge injunction is a core proceeding within the meaning of 28 U.S.C. § 157(b), and therefore the bankruptcy court may enter appropriate orders and judgment in the matter.

■ b. **Fraud on the Court in the Bankruptcy Case:** When a proceeding for redress of damages arising from fraud on the court concerns fraud on the court that occurred in the bankruptcy court and in a particular bankruptcy case, the bankruptcy court's jurisdiction over that case includes authority under 11 U.S.C. § 105(a) to act on the motion and to fashion a remedy. The bankruptcy court's authority under § 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" includes the power to insure the integrity of proceedings in bankruptcy cases. Accordingly, this Court has core jurisdiction over Schlichtmann's demand for damages for fraud on the court insofar as it concerns fraud perpetrated in the bankruptcy court itself, in Schlichtmann's bankruptcy case.

■ c. **Fraud on the Court outside of the Bankruptcy Court:** Schlichtmann complains of fraud on the court that occurred in this court, but he also seeks redress for alleged fraud on the court that occurred in the District Court action, including appeals therein to the Court of Appeals. To the extent that the fraud on the court concerns proceedings in courts other than the bankruptcy court, § 105(a) does not apply. Nor will adjudication of this demand have any effect on Schlichtmann's bankruptcy case. A bankruptcy court's subject matter jurisdiction is limited to "any or all proceedings arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 157(a). The demand for relief for fraud on other courts does not arise under title 11 or in a bankruptcy case. Nor is it "related to" a bankruptcy case. Under the well-accepted test, a proceeding is "related to" a bankruptcy case if it can conceivably have any effect on the bankruptcy case. The present demand does not: it will not affect the scope or enforcement of the discharge or the collection and distribution of assets of the bankruptcy estate.[49] I therefore conclude that this court lacks subject matter jurisdiction over Schlichtmann's demand for relief concerning fraud on the court that allegedly occurred in courts other than the bankruptcy court.

### *Judicial Estoppel and Equitable Relief*

120. In the Motion for Sanctions, Schlichtmann demanded certain equitable relief in the nature of preclusive determinations about facts and rulings pertinent to his claims for fraud on the court and violation of the discharge, even as to the claims themselves.[50] In a motion filed on

---

**49.** Of course, if acts that constitute fraud on other courts are also violations of Schlichtmann's discharge, this Court has subject matter jurisdiction to afford relief for those acts as violations of the discharge, but the operative cause of action would then be violation of the discharge injunction, not fraud on the court.

**50.** The specific demands are set forth above in paragraph 109, subparagraphs a, b, and c, and need not be reiterated here.

February 23, 2005 (to meet the court's deadline for dispositive motions), Schlichtmann made another demand of this nature.[51] In both instances, the basis of the demand for equitable relief is certain alleged misrepresentations and contradictory statements by the Respondents, mostly in the District Court action, regarding TCC's rights in and standing to prosecute the conversion claim. The Court must deny these demands for equitable relief for the following reasons.

a. First, in the present proceedings (and unlike in the District Court action), the Respondents have no burden of proof, and therefore the proposed estoppel is meaningless. As set forth below, the burden of proof as to fraud on the court and violation of the discharge falls entirely on Schlichtmann, who must prove both by clear and convincing evidence.

b. Second, by Schlichtmann's own admission, allegations of fraud are central to his case, not only for fraud on the court but also for violation of the discharge. To establish that fraud (or any portion of it) by fiat or judicial pronouncement and without regard for the underlying facts would be to bypass the entire judicial process and to abandon due process.

c. Third, no cause for judicial estoppel has been shown in the proceedings in the Bankruptcy Court. As I explain below, the fact that TCC, which always held the debt and the security interest, had an obligation to turnover the proceeds of the SCC & H notes to AJV is of virtually no consequence to the determination of whether TCC's actions were

violations of the discharge; whether suing for its own benefit or for AJV's, the claim in question was not subject to the discharge. In the District Court action, this fact became an issue of consequence when and because Schlichtmann purchased TCC's rights. In this proceeding, the new fact is simply a new fact, not a contradictory one, and, as new facts go, not an important one.

### Fraud on the Court

121. Schlichtmann demands damages for fraud on the court that allegedly occurred both in this court and in the District Court and the Court of Appeals. With respect to such conduct as occurred in the District Court and the Court of Appeals, and for the reasons set forth above concerning subject matter jurisdiction, this demand must be denied for lack of subject matter jurisdiction, leaving for adjudication only such fraud on the court as is alleged to have occurred in the Bankruptcy Court.

122. As a species of fraud, fraud on the court must be plead with particularity.[52] In the Motion for Sanctions, Schlichtmann specified the following conduct as the gravamen of his charge: "The fraudulent concealment from ... this Court that Daniel Cadle set up and used [TCC] as the undisclosed and unlawful collection agent for AJV to collect from Schlichtmann on the debts discharged by this Court's 1–28–92 Order [the discharge]."[53] The Motion for Sanctions specified that conduct of this nature occurred in the bankruptcy court when, in TCC's 2–20–02 opposition to Schlichtmann's 2–11–02 Motion for Show Cause

---

51. The specific demands in this motion are set forth at paragraph 115 above.

52. Fed.R.Civ.P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity"), made applicable to this contested matter by Fed. R. Bankr.P. 9014(c).

53. Motion for Sanctions, p. 2.

Order and by attorney Scott Machanic, TCC

> made repeated references to the fact that Cadle was the "secured party"; "holds a security interest in the firm's accounts receivable"; "the attorney fee that was being pursued by The Cadle Company *was the property of the Cadle Company*"; and that Schlichtmann had "converted *The Cadle Company's asset*." [54]

The clear meaning of this pleading, Schlichtmann contended, "was that the security interest at issue was Cadle's property and that Cadle was collecting on its own behalf and not on behalf of another entity." [55] Schlichtmann added that the bankruptcy judge accepted these assertions as true in her 7–24–02 Memorandum of Decision on Schlichtmann's Motion for Show Cause Order, but that the statements were false. This is the full extent of the fraud on the Bankruptcy Court that is specified in the Motion for Sanctions.

■ 123. The Respondents have raised the defense of issue preclusion as an affirmative defense to Schlichtmann's claim for fraud on the court. They argue that the District Court's denial as moot of Schlichtmann's Motion for Evidentiary Hearing Concerning Plaintiff's Fraud Upon the Court precludes him from raising that issue again in the Bankruptcy Court. [56] Schlichtmann disagrees, arguing that the District Court's order was a denial without prejudice, not on the merits.

124. The order by which the District Court denied Schlichtmann Motion for Evidentiary Hearing Concerning Plaintiff's Fraud Upon the Court specified that the motion was denied "as moot." In addition,

in colloquy at the hearing on this motion, the court stated:

> "So I still say the case ought to be dismissed as moot because where is the damage to you [Schlichtmann]? ... there may have been potential damage but he preempted that by buying the thing out. . . . If there has been that kind of fraud, somebody ought to just tell the U.S. Attorney and maybe there will be a prosecution. But I don't know that it presents a case in controversy."

Especially in view of these statements by the court at the hearing, the court's ruling denying the motion as moot must be taken at face value, not as a scrivener's error. It was a determination that, by purchasing TCC's cause of action against him, Schlichtmann had preempted any actual damages that might have resulted from the alleged fraud, and therefore that the motion did not present a justiciable controversy. A denial on the basis of mootness is a determination that the claim in question, for lack of a constitutionally required controversy, is one over which a federal court lacks jurisdiction. It represents a ruling of law as to the availability of relief on that claim in the federal courts. The order therefore disposed of the claim on the merits, not without prejudice.

■ 125. The doctrine of collateral estoppel, or issue preclusion, precludes relitigation of an issue of fact or law as to which four factors are met:

> (1) an identity of issues (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding), (2) actuality of

---

54. Motion for Sanctions, p. 24 (emphasis in original).

55. Motion for Sanctions, pp. 24–25.

56. Schlichtmann did not disclose the district court order to the bankruptcy court in his Motion for Sanctions or at any time thereafter until the Respondents raised this defense at trial.

litigation (that is, that the point was actually litigated in the earlier proceeding), (3) finality of the earlier resolution (that is, that the issue was determined by a valid and binding final judgment or order), and (4) the centrality of the adjudication (that is, that the determination of the issue in the prior proceeding was essential to the final judgment or order).

*Gonzalez–Pina v. Rodriguez*, 407 F.3d 425, 430 (1st Cir.2005). All four requirements are met here.

a. There is an identity of issues in that the District Court motion sought relief for all fraud on the court that had theretofore occurred not only in the District Court but also in the Bankruptcy Court proceedings in 2002, the proceedings that are the subject of the present motion. Moreover, as a case in controversy is always a requirement of any demand for relief in a federal court, the dispositive issue in that proceeding is also an issue here.

b. As the transcript of the earlier proceeding demonstrates, the issue of mootness of the claim for fraud on the court was actually litigated in the earlier proceeding. The requirement of actual litigation is satisfied.

c. As I concluded above, the District Court denied Schlichtmann's motion on the merits, not without prejudice. The court's final order of dismissal of that action was, among other things, a final order on Schlichtmann's motion concerning fraud on the court. The requirement of a final binding order is satisfied.

d. The determination of mootness was undoubtedly essential to the judgment, as the motion was denied "as moot," and the court considered no other issue concerning Schlichtmann's motion.

For these reasons I conclude that the requirements of collateral estoppel are met and that the determination of mootness made by the District Court is binding on Schlichtmann here. His claim for damages for fraud on the court must therefore be denied as moot.[57]

■ 126. Even if the claim for fraud on the court were not precluded by the District Court's denial of the same claim for mootness, the Court would deny the claim because the Schlichtmann has failed to carry his burden as to two necessary elements: (i) falsity of the alleged false statements; and (ii) specific intent on the part of TCC or its attorney Scott Machanic to interfere with the judicial system's ability to impartially adjudicate the motion then under consideration by deceiving the court.[58]

■ a. "A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118

57. The two proceedings share not only this single issue but the very claim at issue here. Accordingly, it would *appear* that the claim for fraud on the court, and not merely the issue of its mootness, is itself also precluded. However, the defense of *claim* preclusion was not raised at trial, and therefore the Court makes no ruling on it here. Had the relevant evidence been brought to the Court's attention at trial—it appears very near the end of the 2500–page record of the district court action that constitutes Debtor's exhibits 2, 6, and 57—the court would have raised the issue *sua sponte*.

58. I do not imply that other elements of the claim have been proven.

(1st Cir.1989). There is substantial authority for the proposition that, at least for purposes of FED.R.CIV.P. 60(b) (where "fraud on the court" is set apart from other "fraud" for which a judgment might be vacated), fraud on the court requires a showing that the court itself was corrupted, and that this requirement can be satisfied by the corruption of an attorney on the theory that the attorney, in the context of the proceeding in question, is acting as an "officer of the court." [59] Where fraud on the court is invoked for a purpose other than to reopen a final judgment, however, there is conflicting authority in this circuit regarding whether fraud by a party, but not involving an officer of the court, may suffice.[60] I will assume without deciding that fraud by a party alone, without the collusion of its attorney, would suffice. In any event, it is clear from the words by which courts have defined this cause of action—"fraud," "scheme," "unconscionable," "*sentiently* set in motion," and "calculated to interfere"—that specific intent, intent to defraud, is a necessary element.[61] Here the alleged fraud is in the nature of a misrepresentation to the court, and therefore the specific intent required is an intent to deceive the court. The plaintiff also bears the further burden of proving falsity. The burden is clear and convincing evidence.

*Id.* at 101 ("It is common ground that clear and convincing evidence is required."); *Aoude v. Mobil Oil Corp.,* 892 F.2d at 1118 (requiring proof "clearly and convincingly").

b. On the basis of findings set forth above (at ¶ 79), I concluded that Schlichtmann has not sustained his burden of proof as to falsity and intent to deceive. There was no fraud on the court.

### Violation of Discharge

 127. The Bankruptcy Code provides no express remedy, and therefore no private right of action, for violation of the discharge. A debtor may enforce the discharge injunction only through contempt proceedings. As set forth above, the bankruptcy court has authority under 11 U.S.C. § 105(a), and perhaps also inherently, to enforce the discharge by issuance of contempt orders and imposition of contempt sanctions. *Bessette v. Avco Financial Services, Inc.,* 230 F.3d at 444–45; *McDonald v. Norwest Financial, Inc. (In re McDonald),* 265 B.R. 3, 8–9 (Bankr. D.Mass.2001) (construing *Bessette* as requiring enforcement by contempt proceedings). The proceeding being in the nature of contempt, the debtor's burden of proving contempt, a violation of the discharge, is the clear and convincing standard.[62]

**59.** *Tri–Cran, Inc. v. Fallon (In re Tri–Cran, Inc.),* 98 B.R. 609, 616 (Bankr.D.Mass.1989) ("Where a judgment is obtained by fraud perpetrated by an attorney acting as an officer of the court, the judgment may be attacked for fraud on the court.").

**60.** *Hull v. Municipality of San Juan,* 356 F.3d 98 (1 st Cir.2004) (affirming dismissal of complaint for fraud by plaintiff in answering discovery); *but see Sandstrom v. ChemLawn Corp.,* 904 F.2d 83, 88 (1st Cir.1990) ("a fraud on the court requires that a litigant and his lawyer concoct some unconscionable scheme

calculated to impair the court's ability fairly and impartially to adjudicate a dispute").

**61.** *Aoude v. Mobil Oil Corp.,* 892 F.2d at 1118 (definition of fraud on the court); *Hull v. Municipality of San Juan,* 356 F.3d at 101 (fraud on the court required inquiry into perpetrator's state of mind or scienter).

**62.** *Langton v. Johnston,* 928 F.2d 1206 (1st Cir.1991) ("a complainant must prove civil contempt by clear and convincing evidence"); *In re Dunn,* 324 B.R. 175, 179 (D.Mass.2005) (clear and convincing standard for contempt applies in bankruptcy discharge context); *In*

128. In order to establish civil contempt of the discharge order, such as would justify a sanction in the form of compensatory damages and attorney's fees, the Debtor must prove that (i) the alleged contemnor committed an act that violated the discharge with general intent to commit the act and (ii) with knowledge of the discharge order.[63] Due process further requires that the discharge order, or the relevant provisions of law that define its scope, be clear and unambiguous as to whether the conduct in question is prohibited.[64] However, neither specific intent to violate the discharge order nor bad faith is required.[65] Where, as here, the conduct in question is not overtly violative of the discharge order (as, for example, would be a complaint to enforce a discharged debt *in personam*), "the core issue is whether the creditor acted in such a way as to coerce or harass the debtor improperly." *Pratt,* 462 F.3d at 19 (internal quotations omitted). The standard is "objective" and in each case assesses the conduct "in the context of its particular facts." *Id.*

129. Punitive sanctions, available for criminal contempt, would be appropriate where, in addition to the requirements of civil contempt, the creditor acted in bad faith, with knowledge of the wrongfulness of its actions. *In re Latanowich,* 207 B.R. 326, 337 (Bankr.D.Mass.1997) (punitive sanctions appropriate for violation of discharge involving calculated disregard of reaffirmation requirements). The purpose of criminal contempt is to vindicate the authority of the court. *Eck v. Dodge Chemical Company (In re Power Recovery Systems, Inc.),* 950 F.2d 798, at 802 n. 18 (1st Cir.1991). It requires proof beyond a reasonable doubt. *Id.*

> In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future.

*U.S. v. United Mine Workers of America,* 330 U.S. 258, at 303–04, 67 S.Ct. 677, at 701, 91 L.Ed. 884, at 917–18 (1947).

130. It is important to determine at the outset precisely what the discharge did and what it did not do. Schlichtmann

---

re Parker, 334 B.R. 529 (Bankr.D.Mass.2005) (same). The court of appeals has not resolved the issue. See *Pratt v. General Motors Acceptance Corp. (In re Pratt),* 462 F.3d 14, 21 (1st Cir.2006).

**63.** *McDonald v. Norwest Financial, Inc. (In re McDonald),* 265 B.R. at 9 (*prima facie* claim for contempt of discharge requires pleading that defendant knew of discharge order and intentionally engaged in conduct that violated it); *In re Singleton,* 269 B.R. 270, 275 (Bankr. D.R.I.2001) (same), *rev'd on other grounds,* 284 B.R. 322 (D.R.I.2002). The Court of Appeals has held that this standard applies to violations of the automatic stay, *Fleet Mortgage Group., Inc. v. Kaneb,* 196 F.3d 265, 269 (1st Cir.1999) ("The standard for a willful violation of the automatic stay under § 362(h) is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation"; specific intent to violate the stay is unnecessary), and, in *Pratt,* implied that this same standard applies to violations of the discharge. *Pratt,* 462 F.3d at 20–21 (finding willful violation of discharge, and holding that quantum-of-evidence as to knowledge and general intent need not be addressed because the record in contempt proceeding for violation of discharge was clear as to both).

**64.** *Dunn,* 324 B.R. at 179, and cases cited.

**65.** *Pratt,* 462 F.3d at 20–21 (conduct violated discharge notwithstanding absence of bad faith); *McDonald,* 265 B.R. at 9 (state of mind or intent to violate the discharge is not a consideration for civil contempt).

received a chapter 7 discharge in a case commenced in 1991. By statute, and by its express terms, his discharge operated as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt[66] as a personal liability of the debtor, whether or not discharge of such debt is waived.

11 U.S.C. § 524(a)(2). In 1991 as now, the scope of a chapter 7 discharge was limited in three important respects.

■■■■■ a. First, it barred the collection of a debt only "as a personal liability of the debtor." Id. It had no effect on security interests on the debtor's assets, whether or not the debtor was also personally liable for the debts secured by those security interests, and it did not bar actions to enforce those security interests. Johnson v. Home State Bank, 501 U.S. 78, 84, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991) ("a bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor in personam— while leaving intact another—namely an action against the debtor in rem"); Cadle Co. v. Schlichtmann, 267 F.3d 14, 19 (1st Cir.2001) ("such a discharge extinguishes only in personam claims and generally has no effect on in rem claims against property"); Pratt, 462 F.3d at 17. Consequently, Schlichtmann's in personam liability on the SCC & H notes, both as a general partner of SCC & H and as a guarantor of SCC & H's

liability on the notes, was discharged. However, as the Court of Appeals has already ruled, TCC's security interest in the Groton fee survived the bankruptcy.[67] Cadle Co. v. Schlichtmann, 267 F.3d at 19, 21 ("Cadle's security interest in this property was not affected by Schlichtmann's bankruptcy"; and "Cadle had a security interest in the entire Groton fee"). TCC was entitled to take such action as was necessary to protect and enforce this property interest. Pratt, 462 F.3d at 17 (secured creditor's lien normally survives bankruptcy proceeding and discharge and is enforceable in accordance with state law); Arruda v. Sears, Roebuck & Co., 310 F.3d 13 (1st Cir.2002) (creditor enforcing its security interest by entering into post-discharge redemption agreements was not violating discharge).

■■■■■ b. Second, the discharge applied only to debts that arose before the date of the order for relief under chapter 7, which in this instance was the date of the bankruptcy filing.[68] 11 U.S.C. § 727(b) (subject to exceptions not applicable here, "a discharge under subsection (a) of this subsection"—that is, a chapter 7 discharge—"discharges the debtor from all debts that arose before the date of the order for relief under this chapter" (emphasis added)). Debts that arose after the bankruptcy filing, even to creditors owed prepetition debts, were not affected by it. Consequently, TCC's tort claim against Schlichtmann for conversion, which arose only in 1995,

---

**66.** "Any such debt" refers, in relevant part, to "any debt discharged under section 727" of the Bankruptcy Code. 11 U.S.C. § 524(a)(1).

**67.** I agree with Judge Kenner's 2002 ruling that "by stare decisis (if not also collateral estoppel and the law of the case), this Court is bound by the decision of the Court of Appeals on the extent of Cadle's security interest." Nor has Schlichtmann articulated a basis on

which this court could revisit the issue or, assuming reconsideration were justified, reach a different result.

**68.** "The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." 11 U.S.C. § 301.

was not subject to the discharge. The conversion claim was an *in personam* claim for violation of a property right that survived his discharge. Because the claim arose postpetition, it was not subject to the discharge. Likewise, any tort claim that TCC may have against Schlichtmann on the basis of conduct that occurred a decade and more after Schlichtmann's bankruptcy filing is not subject to the discharge.

c. Third, the discharge prohibits prepetition creditors only from collecting their prepetition debts. It is not lifelong shield against other acts—including demands, threats, assertions of claims, and litigation—by those same creditors, even where these other acts are undertaken wrongfully and in bad faith. If an act is not in fact one to collect or enforce a prepetition debt, then whatever its faults, it is not a violation of the discharge, even though undertaken by the holder of a discharged debt.

131. Even a creditor having legitimate rights that survived the bankruptcy, such as a security interest in an asset of the debtor, or that arose after the bankruptcy, such as a defamation claim arising from postbankruptcy conduct, can use those legitimate rights in such a way as to enforce a discharged debt, and this conduct too would constitute a violation of the discharge. In *Pratt*, a secured creditor had a legitimate state law right to refuse to release its lien on the debtors' car. Finding that the creditor used this right not to protect its interest in the vehicle, which had no value to the creditor or the debtor, but to coerce the debtors into making payments on the discharged debt, the Court of Appeals held that the creditor's conduct was coercive in effect and therefore a violation of the discharge. *Pratt*, 462 F.3d at 19–20. "[E]ven legitimate state law rights ex-

ercised in a coercive manner might impinge upon the important federal interest served by the discharge injunction." *Id.* at 19. The court cautioned: "We do not suggest that a secured creditor invariably would be in violation of the discharge injunction were it to insist upon its *in rem* rights under state law." *Id.* at 20. In that instance, however, the secured creditor had "identifie[d] no compelling reason for doing so," as the lien was worthless. *Id.* The only evident reason for the creditor to have insisted on its *in rem* rights was to coerce payment of the discharged debt. Accordingly, the court must scrutinize even acts that are not overtly violative of the discharge to determine whether the creditor is using them to collect a discharged debt. An act may be something other than what it appears to be. However, the burden remains on the debtor to prove not merely that a particular act is not what it appears to be, but that the act in question is one to collect a discharged debt *in personam*.

132. Schlichtmann bases his case on eight different alleged violations of the discharge (enumerated in paragraphs 110 and 117 above). I will address each in turn, beginning with the District Court action. With respect to each act at issue except only the prosecution of the District Court action to the extent that it was based on the contract theory, which I will address below, the discharge order and the law defining its scope were clear and unambiguous. Also, with respect to every act at issue, TCC and AJV had knowledge of the discharge at the time of the act complained of; Daniel Cadle had knowledge of the discharge at the time of the acts in which he was involved, commencing on August 2002. As to Daniel Cadle, however, Schlichtmann has adduced no evidence that Daniel was personally involved in the alleged violations that occurred prior to August 2002. He had no role in the credit

report, in the alleged threats in 1992 and 1993, and in the attempt to instigate an investigation in 1998; and his involvement in the District Court action commenced only in August 2002.

133. My holdings below on the various acts in question are affected by and reflective of four over-arching findings, distilled from the lengthy factual record:

a. First, none of the acts of which Schlichtmann complains was *overtly* violative of the discharge.

b. Second, until he dissipated the Groton proceeds in June, 1995, Schlichtmann essentially had control of the Groton action and therefore of TCC's collateral. Cecil, and through him TCC, were very interested in making sure that Schlichtmann turned those proceeds over to TCC upon their release from escrow. The proceeds by themselves were a source of $300,000 recovery. Given the size of this fund in relation to the amount of the debt that TCC had bought, the availability of three other guarantors from whom to seek additional recovery, and the fact of the discharge, *TCC had no need* to look beyond the collateral to Schlichtmann as a source of *in personam* recovery—and good reason not to-and TCC showed no signs of having done so. TCC's desire to enforce its rights in the collateral suffices to explain all the Respondents' actions through the conclusion of the District Court action. In view of this valid claim to the collateral—the elephant in the room that Schlichtmann is determined never to acknowledge—and of the valid claim for conversion arising from Schlichtmann's 1995 actions, one would need very damning evidence indeed to justify a finding by clear and convincing evidence that TCC was attempting not merely to enforce its *in rem* rights but

also, or instead, to obtain payment from Schlichtmann *in personam* on the prepetition debt.

c. Third, although Schlichtmann has invested heavily in accusations that TCC acted fraudulently by its nondisclosure of the interest of AJV in this debt, he has not shown by clear and convincing evidence, or any evidence at all, that (1) such disclosure was necessary, (2) that the nondisclosure was done with intent to deceive or gain unfair advantage, (3) that the nondisclosure did or might have gained for TCC an advantage, or, most importantly, (4) that it somehow converted otherwise innocent actions into violations of the discharge. Regardless of whether it was acting for itself or for AJV, TCC was at all times enforcing *in rem* rights that had not been affected by the discharge. If disclosure of AJV's interest was necessary, then, at worst, TCC was enforcing the *in rem* rights incorrectly. But the rights being enforced were still rights that were outside the scope of the discharge, and TCC's actions would no more have been a violation of the discharge for this impropriety.

d. Fourth, in 2002 and 2003, Schlichtmann turned his life into a crusade against TCC, making good on his 1995 threat of litigation that would go on "for a very, very long time." He attacked TCC in the press, on the internet, and in court and administrative proceedings, as a party in his own right and as counsel to others. His actions were extensive and costly to TCC. The Respondents quite reasonably recognized this conduct as a threat to their business, and they responded accordingly. The actions by which Schlichtmann provoked this response more than suffice to explain the Respondents' various responses, both the refined (the defamation actions) and the blunt and visceral (the threats) and

everything in between. However ugly some of these responses may have been, they clearly were not efforts to collect a prepetition debt.

### a. *The District Court Action*

■ 134. As against Schlichtmann, the District Court action was narrowly tailored to enforce TCC's *in rem* rights in the collateral by a count to reach and apply (which was early dismissed, and as to which I have virtually no evidence) and, more importantly, another for conversion on account of tortious injury to those rights. The complaint expressly indicated that *in personam* counts on the SCC & H notes against the other partners were not being brought against Schlichtmann. TCC's theory of the case was rejected on summary judgment, and TCC was forced to try the matter on theories not of its choosing, first apportionment and then contract, both of which failed. On appeal, however, the conversion theory as originally proposed was vindicated: the Court of Appeals ruled that TCC was entitled to judgment as a matter of law. Therefore, the action was based on a theory of recovery to which the discharge did not apply: it was an *in personam* action for a tort claim that arose long after the bankruptcy filing and that concerned a valid property interest that itself survived the bankruptcy. Nor has Schlichtmann shown that the action was prosecuted in such a way that these valid rights were used for the illegitimate purpose of coercing payment on Schlichtmann's discharged *in personam* liability on the notes.

135. To a limited extent—beginning on the fifth day of trial and ending with the 2001 decision on appeal—the prosecution of the conversion count was based on what has been referred to as the contract theory (including its variation based on promissory estoppel). The alleged contract consisted of a promise by Schlichtmann to transfer the Groton fee to TCC in exchange for TCC's promise of forbearance against his former partners. In his motion for directed verdict in the District Court, Schlichtmann argued that this theory must fail as a matter of law because the alleged contract, if found to exist, would constitute a reaffirmation agreement that was unenforceable because it did not conform to the procedural requirements of 11 U.S.C. § 524(c). Schlichtmann now contends that TCC's prosecution of its conversion count on this theory was a violation of § 524(c) and therefore a contempt of the discharge injunction. The Court concludes otherwise for several reasons.

■ a. First, the District Court denied the motion for directed verdict, ruling that "there is a version of the evidence that would permit the jury to find a valid post-discharge undertaking." In essence, the court ruled that the alleged contract that underlay the conversion was not a reaffirmation agreement within the scope of § 524(c), and that its enforcement was not a violation of the discharge. This ruling is the law of the case, and I adopt and it as such.

■ b. Second, I would reach the same result were I ruling on the issue anew. The substance of the alleged agreement obligated Schlichtmann to do no more than to honor TCC's rights in the collateral by turning over the Groton fee. This Schlichtmann was already obligated to do, by virtue of TCC's valid security interest in the fee and Cecil's demands that Schlichtmann honor it. The alleged agreement did not require payments from any other source or reaffirmation of Schlichtmann's obligation on the SCC & H notes, only turnover of the collateral. This alleged agreement was therefore not a reaffirmation agreement within the meaning of § 524(c). *Arruda v. Sears, Roebuck & Co.,* 310 F.3d 13,

21–22 (1st Cir.2002) (creditor enforcing its security interest by entering into post-discharge redemption agreements was exercising *in rem* rights, not seeking to impose personal liability on account of discharged debts; the redemption agreements "relate[d] to discharged debts in only the most tangential way" and therefore were deemed to fall outside the purview of § 524(c) and not to violate debtors' discharges).

 c. Third, the theory was based on testimony that Schlichtmann had elicited from Cecil. Although the jury returned a verdict for Schlichtmann on the conversion count as based on this theory, there has been no evidence that Cecil's testimony was not truthful or given in good faith. I find it more likely than not that Schlichtmann made representations to Cecil that justified the indignance that resulted when Schlichtmann did not turnover, or arrange for turnover of, or hold in escrow even a portion of the Groton fee. That is to say, the testimony on which the contract theory was founded was given by Cecil in good faith, with an honest belief that Schlichtmann had made a promise to him that Schlichtmann then failed to honor.

 d. Fourth, in order to establish contempt of the discharge, the discharge order and the provisions of law that define its scope must be clear and unambiguous as to whether the conduct in question is prohibited. *Dunn*, 324 B.R. at 179. In this instance, the theory in question was first recognized as a viable theory of recovery, and made the operative theory in the case, not by TCC but by the district judge, who was quite aware of Schlichtmann's discharge and, at the time, expected to rule on Schlichtmann's counterclaim that the very action then pending was a violation of the discharge. The same judge, in denying Schlichtmann's motion for directed verdict, also expressly ruled that the alleged agreement did not run afoul of § 524(c) or the discharge. In view of these rulings, and of my own conclusion above that the alleged agreement was not subject to § 524(c), the law was not sufficiently clear on this issue to permit a finding of contempt (if the prosecution of the contempt count on this theory were deemed a violation of the discharge at all).

### b. *The Credit Report*

 136. On the basis of findings set forth above, I conclude that Schlichtmann has not demonstrated by clear and convincing evidence that the credit report was an act to collect a debt. Any coercive power it may have had over Schlichtmann was dissipated virtually as soon as he learned of the report because Cecil readily agreed to correct it and did correct it. There is no evidence that Cecil used it even to pressure Schlichtmann into honoring TCC's security interest in the Groton fee—a use that would not have violated the discharge—much less to coerce payment by some other means on the discharged *in personam* liability. Moreover, the gravamen of Schlichtmann's charge is that the reported information was false, but Schlichtmann had adduced no evidence as how it came to be that *false* information was reported. I cannot find that it was an intentional act on the part of TCC or its agents. The inclusion of false information in the reported data may just as easily have been the result of negligence.

### c. *Threats in 1992 and 1993*

 137. In the Motion for Sanctions, Schlichtmann contends that the Respondents pressured him to pay the discharged debt by making malicious threats to expose to governmental authorities that he had engaged in bankruptcy fraud. Specifi-

cally, he contends that in 1992 and 1993, Cecil, both directly and though Schlichtmann's· former partner, William Crowley, told Schlichtmann that he "wasn't out of this" and threatened to reveal that Schlichtmann had committed fraud in his bankruptcy filing by failing to inform the bankruptcy court that Schlichtmann had taken over the Groton matter and would be receiving a legal fee. In the proposed findings of fact that he filed after trial, Schlichtmann makes no mention of any direct communication from Cecil in this period; instead, he proposes findings only as to indirect communications made by Cecil to Crowley and related by Crowley to Schlichtmann. With respect to the indirect communications allegedly made through Crowley, I have found above (at paragraph 32) that the evidence of the alleged communications is hearsay and unreliable, and therefore that Schlichtmann has not carried his burden as to these. As for the direct communications, Schlichtmann appears not to rely on it any longer. However, as I have found above at paragraph 34, Schlichtmann has not sustained his burden of proof as to this alleged communication either. Moreover, there is no evidence from which the court could infer that alleged threats of fraud would have served to compel payment of the discharged *in personam* liability. In Cecil's communications with Schlichtmann during this period, all initiated by Schlichtmann, Cecil made clear to Schlichtmann that his concern was with the Groton receivable, that it belonged to TCC and that Schlichtmann was obligated to turn it over to TCC. Schlichtmann did not testify that Cecil ever demanded from Schlichtmann any payment other than turnover of the Groton fee. Therefore, threats of the type alleged here might reasonably have been under-

stood as efforts to compel Schlichtmann to honor TCC's security interest, but not as efforts to compel payment of the discharged *in personam* liability. For these reasons, Schlichtmann has failed to carry his burden of proof as to the alleged threats in 1992 and 1993.

#### d. *1998 Attempt to Instigate an Inquiry*

138. Schlichtmann contends that the Respondents pressured him to pay the discharged debt by attempting in 1998 to instigate an inquiry by the U.S. Trustee into whether he had committed fraud in his bankruptcy case. These allegations are the subject matter of paragraphs 52 to 61 above. For the reasons stated there, I find that Schlichtmann has not proven by clear and convincing evidence that the actions in question were an attempt to collect the discharged *in personam* liability.

139. To the findings articulated above, I add only the following rulings of law that informed the findings. A discharge does not prohibit a creditor from seeking redress for a debtor's fraud or malfeasance in a bankruptcy case. After entry of a discharge, a creditor may (i) seek revocation of the discharge, 11 U.S.C. § 727(d); (ii) ask that the case be re-opened and a trustee appointed to recover an undisclosed asset (or the value thereof) and administer it for the benefit of creditors; or (iii) seek criminal charges against the debtor for bankruptcy fraud. However, a creditor may not use even a legitimate right to such redress to pressure the debtor to pay the discharged *in personam* liability.[69] *Pratt*, 462 F.3d at 19 (even legitimate state law rights of secured creditor as to its collateral, when exercised in a coercive manner, might violate the discharge). Here, TCC had a good faith

---

69. Of course, the creditor may seek to vacate the discharge with the intent to collect the debt *after* the discharge is vacated. The collection action must await the vacatur.

basis for believing that Schlichtmann should have disclosed the Groton receivable on his schedules but had failed to do so, and TCC instigated this inquiry in order to obtain redress for this omission. TCC also instigated this inquiry in part to pressure Schlichtmann into settling the conversion count. This the discharge did not prohibit. Rather, it prohibited TCC from using this process to collect the discharged *in personam* liability, but Schlichtmann has not shown by clear and convincing evidence that TCC's overtures to the chapter 7 trustee and the U.S. Trustee served that purpose.

### e. *Daniel Cadle's Threats and Attempt to Instigate an Inquiry*

140. Schlichtmann contends that by two acts committed by Daniel Cadle in 2003, the Respondents were attempting to coerce Schlichtmann into paying on the discharged debt and refraining from seeking redress in this court. The first was a threat made by Daniel against Schlichtmann in an October 2003 telephone conversation; the second was the filing of letter in this case on December 19, 2003, in which Daniel asked that the bankruptcy court reopen Schlichtmann's bankruptcy case to investigate allegations that Schlichtmann had committed fraud in his case. Findings regarding these allegations are set forth at paragraphs 102, 104, and 106 above. For the reasons stated there, I conclude that these acts were not attempts to collect the discharged *in personam* liability. That Daniel may have been using them to dissuade Schlichtmann from prosecuting a motion in this court for sanctions for violation of his discharge is irrelevant. These clearly were not acts to collect the discharged debt.

### f. *Defamation Action*

141. Schlichtmann contends that TCC's 2005 filing of its defamation complaint in Massachusetts Superior Court is further evidence of the Respondents' contempt of the discharge injunction. Findings regarding this allegation are set forth at paragraph 101 above. For the reasons stated there, I conclude that the filing of the Massachusetts dischargeability complaint was not an attempt to collect the discharged *in personam* liability. Schlichtmann contends that it was also an attempt to interfere with the adjudication of his Motion for Sanctions. I find that it was not such an attempt but merely a continuation with proper personal jurisdiction' of an effort commenced in 2003 in federal court in Ohio; but even if this were such an attempt, it would be irrelevant because the act in question is nonetheless not a violation of the discharge.

### g. *Letter to Lynda Borucki*

142. Schlichtmann contends that Daniel Cadle's fax transmission to Lynda Borucki of April 12, 2005, is further evidence of the Respondents' contempt of the discharge injunction. Findings regarding this allegation are set forth at paragraphs 103, 105, and 106 above. For the reasons stated there, I conclude that the transmission of this letter was not an attempt to collect the discharged *in personam* liability.

143. **Conclusion as to Alleged Violations of the Discharge:** I have found that Schlichtmann has failed to sustain his burden of proof as to each and every alleged violation of the discharge. He has proven no violation of his discharge by TCC, AJV, or Daniel Cadle.[70]

---

70. Though I have found that Schlichtmann has not demonstrated an entitlement to relief, his Motion for Sanctions was not frivolous, and I do not find that he was unjustified in having filed it.

*Request for Injunction Against Violation of Discharge*

144. Most of Schlichtmann's requests for equitable relief were addressed above. In addition, he seeks an order enjoining the Respondents "from engaging in any further conduct against Schlichtmann in violation of the [discharge]." The discharge is itself an injunction against the very conduct it prohibits, so a further injunction of the same nature would only be redundant. If, by this request, Schlichtmann seeks instead a contempt order to enforce compliance with the discharge, his motion must be denied, as Schlichtmann has proven no contempt of the discharge.

*CONCLUSION*

145. For the reasons set forth above, the Court concludes that the Motion for Sanctions must be denied in all respects. A separate order will enter to that effect.